MARSHA DIENSTAG *et al.*, Plaintiffs-Appellees, v. LAWRENCE MARGOLIES, Defendant-Appellant.

First District (3rd Division)   No. 1—06—1558

Opinion filed September 30, 2009.—Rehearing denied December 4, 2009.

Ruff, Weidenaar & Reidy, Ltd., of Chicago (James R. Quinn and Todd M. Porter, of counsel), and Kavanagh Grumley & Gorbold LLC, of Joliet (Pamela Davis Gorcowski, of counsel), for appellant.

Law Offices of Kenneth C. Chessick, of Schaumburg (Kenneth C. Chessick, of counsel), and Novoselsky Law Offices, of Chicago (David A. Novoselsky and Brian A. Schroeder, of counsel), for appellees.

JUSTICE COLEMAN delivered the opinion of the court:

Defendant, Dr. Lawrence Margolies, appeals from an order of the circuit court of Cook County entering judgment on the verdict in favor of plaintiffs in the remitted amount of $5,450,000. In a medical malpractice action, plaintiffs Marsha Dienstag and Gary Dienstag alleged that Dr. Margolies, a gynecologist, negligently failed to timely diagnose Marsha Dienstag's breast cancer. Following the trial, the jury returned a verdict in favor of plaintiffs in the amount of $5,950,000. The trial court denied defendant's motion for judgment notwithstanding the verdict or, alternatively, for a new trial and granted in part defendant's motion for remittitur reducing the verdict by $500,000.

Defendant argues on appeal that the trial court erred by denying his posttrial motion for judgment notwithstanding the verdict or, alternatively, a new trial because, at the very least, the verdict was against the manifest weight of the evidence. Defendant also contends that he is entitled to a new trial just on damages or, alternatively, additional remittitur. Defendant further argues that he is entitled to a new trial because statements from plaintiffs' counsel and a witness, as well as improper evidentiary rulings, deprived defendant of a fair trial. For the reasons discussed below, we affirm.

## BACKGROUND

In May 2000, Marsha Dienstag (plaintiff or Marsha) was 54 years old when she was diagnosed with Stage III breast cancer. Dr. Lawrence Margolies (defendant) had been Marsha's gynecologist since the mid-1980s. Marsha had a family history of cancer; an aunt had had breast cancer and a grandmother had had ovarian cancer. In 1991, after a mammogram showed an area of calcification in her left breast, Marsha had a biopsy. The biopsy was benign, but revealed atypical ductal hyperplasia. Marsha continued to have annual mammograms. In February 1998, Dr. Margolies prescribed estrogen to Marsha to alleviate some symptoms of menopause.

In July 1998, Marsha had her annual mammogram. The radiologist's report stated that the tissue was dense, which may lower the sensitivity of mammography. The report also found that there was a "benign-appearing focal asymmetric density in the left breast in the axillary tail position." The radiologist recommended returning for a mammogram in one year.

In July 1999, Marsha returned for her annual mammogram. The radiologist's report again stated Marsha's breast tissue is dense, which may lower the sensitivity of mammography. The report also found "asymmetric increased density left breast compared to right with discrete nodular areas probably cysts or fibroadenoma." The radiologist's assessment was "probably benign," but he recommended an ultrasound of the left breast. Marsha had an ultrasound that indicated "no masses or cysts; that the areas of concern represented dense, but otherwise normal glandular tissue." The radiologist assessed the findings as probably benign and recommended a one-year follow-up.

Marsha returned to see Dr. Margolies on November 2, 1999, complaining of breast tenderness and enlargement. Dr. Margolies physically examined Marsha, but at that time he felt no dominant lump. Dr. Margolies continued Marsha on estrogen and told her to see him in six months. When she returned on May 4, 2000, there was a palpable lump. Dr. Margolies ordered a mammogram and ultrasound that recommended a surgical consultation to remove a four-centimeter solid mass. Dr. Margolies referred Marsha to a general surgeon for consultation. The surgeon biopsied the mass and found it was malignant. Marsha then had a modified radical mastectomy to entirely remove her left breast and any involved lymph nodes. Following her mastectomy, Marsha underwent radiation for 5 days a week for 5 to 6 weeks and chemotherapy for 24 weeks. Thereafter, Marsha had reconstructive surgery.

Marsha Dienstag and her husband, Gary Dienstag, filed a complaint in negligence seeking damages against Dr. Margolies for failing to timely diagnose her breast cancer. Plaintiffs alleged that Dr. Margolies breached the standard of care by failing to discontinue estrogen and by failing to refer Marsha to a surgeon following either of her mammograms in 1998 or 1999. Plaintiffs alleged that had Dr. Margolies made such a referral in 1998 or 1999, Marsha would not have had to undergo a radical mastectomy of the left breast and such extensive chemotherapy and radiation, and the cancer would not have spread to her lymph nodes.

At the jury trial, plaintiffs presented testimony from Dr. Douglas Merkel, Marsha's treating oncologist, Dr. William Matviuw, a retained expert obstetrician-gynecologist who gave standard of care testimony, and Dr. Lawrence Hollander, a retained general surgeon who gave proximate cause testimony. Plaintiffs Marsha and Gary Dienstag each testified. Dr. Margolies was called by plaintiffs as an adverse witness. Marsha's treating physical therapist as well as her treating orthopedic surgeon also testified in plaintiff's case-in-chief.

Dr. Margolies testified on his own behalf. Defendant presented expert testimony from Dr. Andrew Roth, an obstetrician-gynecologist, and Dr. Bruce Silver, a diagnostic radiologist. Defendant also presented testimony from Marsha's treating radiation oncologist.

On October 17, 2005, the jury returned a verdict in favor of plaintiff, itemized as follows for Marsha Dienstag: disfigurement $1 million; loss of normal life $1,375,000; pain and suffering $2 million; medical expenses $325,000; lost salaries and benefits $300,000; and possibility of cancer recurrence $650,000. The jury also awarded damages to Gary Dienstag, itemized as follows: loss of society and companionship $100,000; and loss of services $200,000. The jury verdict totaled $5,950,000.

Defendant filed a posttrial motion seeking judgment notwithstanding the verdict or, alternatively, a new trial. Defendant also sought remittitur of the verdict to a total of $1 million (the limits of Dr. Margolies' malpractice insurance policy). The trial court denied defendant's posttrial motion for judgment notwithstanding the verdict or a new trial and granted in part defendant's motion for remittitur. The trial court remitted the verdict as follows: Marsha's damages for loss of normal life were reduced from $1,375,000 to $1,275,000; Marsha's damages for lost salaries and benefits were reduced from $300,000 to $50,000; and Gary's damages were reduced from a total of $300,000 to $150,000. The trial court entered judgment on the verdict in the amount of $5,450,000. This appeal followed.

## DISCUSSION

### 1. Mootness

Prior to reaching the merits of the appeal, we address, as a threshold issue, plaintiffs' argument that the appeal is moot. In response to Dr. Margolies' appeal, plaintiffs argue that this court should dismiss the appeal as moot because the Dienstags entered an "assignment and forbearance" agreement with Dr. Margolies. The agreement assigns to the Dienstags Dr. Margolies' claim against his malpractice insurance carrier (ISMIE) for "bad-faith refusal to settle," in exchange for the Dienstags' agreement that they will not seek payment of the excess judgment (*i.e.*, the amount of the judgment exceeding the limits of Dr. Margolies' policy) from Dr. Margolies. Plaintiffs contend that this agreement renders the instant appeal moot because there is no longer a "live controversy" between the parties. We disagree.

In support of this argument, plaintiffs cite only cases expounding general propositions of mootness and none that require dismissal of the present appeal. This court addressed this very issue in *Ford v. Herman*, 316 Ill. App. 3d 726 (2000), and concluded that an appeal such as the one pending is not moot.

In *Ford*, the plaintiffs sought to recover damages for injuries sustained in a vehicle collision with the defendant. *Ford*, 316 Ill. App. 3d at 728. The defendant was insured by Gallant Insurance Company with applicable bodily injury limits of $20,000. Pursuant to his contract with Gallant, the carrier provided the defendant with legal counsel. *Ford*, 316 Ill. App. 3d at 729. Following the trial, the jury returned a verdict for the plaintiffs in the amount of $78,693. The jury also awarded $6 million in punitive damages. The defendant appealed. *Ford*, 316 Ill. App. 3d at 729.

After judgment was entered on the jury's verdicts, Gallant, as the defendant's insurer, tendered payment of the policy limits ($40,000) plus interest and costs to the plaintiffs. Upon receipt of the payment, the plaintiffs executed a partial satisfaction of the judgment, which was filed in the circuit court. *Ford*, 316 Ill. App. 3d at 730. Thereafter, in exchange for a release from further satisfaction of the judgment balance, the defendant assigned his chose in action against Gallant for its bad-faith refusal to settle the claim within the policy limits. *Ford*, 316 Ill. App. 3d at 730.

The plaintiffs sought dismissal of the appeal on mootness grounds. The plaintiffs argued that since the defendant had been released from further personal liability, only Gallant and its attorneys were pursuing the appeal. Thus, the plaintiffs contended that the appeal was moot

because there was no real party in interest to pursue the matter. *Ford*, 316 Ill. App. 3d at 730. The court disagreed.

The court found that the partial satisfaction and covenant not to execute on the judgment balance could not extinguish the defendant's right to challenge the judgment on appeal. *Ford*, 316 Ill. App. 3d at 731. The court reasoned that the defendant was the real party in interest and thus his insurer could insist that he was contractually bound to cooperate in the appeal. Furthermore, it would be in the defendant's interest to do so because otherwise he could face further liability from his insurance company in the event that it becomes responsible for paying the excess judgment. The court also considered other possible means by which the defendant could face financial repercussions from having such a large judgment against him. Therefore, the court concluded that it was in the defendant's interest to seek to have the judgment reversed or reduced. *Ford*, 316 Ill. App. 3d at 731. In reaching this conclusion, the court reviewed the assignment agreement and found nothing therein that required the defendant to drop the appeal. *Ford*, 316 Ill. App. 3d at 731.

■ Likewise, the present appeal is not moot. Just as in *Ford*, the parties in the instant case executed an agreement by which the Dienstags agreed not to pursue payment of the judgment beyond Dr. Margolies' policy limits from Dr. Margolies personally in exchange for an assignment of his cause of action against his insurance carrier for a claim of bad-faith refusal to settle within the $1 million policy limits. Also, as with the defendant in *Ford*, it is in Dr. Margolies' interest to seek reversal or reduction of the judgment. Although the terms of the assignment and forbearance agreement would preclude the Dienstags from seeking payment of the excess judgment from Dr. Margolies, he could face financial liability from his insurance carrier if it is required to pay the entire judgment. Moreover, there is nothing contained in the assignment and forbearance agreement that requires Dr. Margolies to drop this appeal. Therefore, we conclude that the present appeal is not moot. See *Ford*, 316 Ill. App. 3d at 731.

## 2. Merits

### A. *Judgment Notwithstanding the Verdict or a New Trial*

Turning to the merits of the appeal, initially, Dr. Margolies argues that he is entitled to judgment notwithstanding the verdict or, alternatively, he is entitled to a new trial. Dr. Margolies contends that he responded appropriately based on the medical records and the testimony of Dr. Margolies himself, both of defendant's experts, and Marsha's treating oncologist Dr. Merkel, that Dr. Margolies could reasonably rely on the various radiology reports, that he followed up

with any recommendations made on the radiology reports, and that the reports showed no indication of malignancy, and in May 2000, when a malignant condition was identified and further follow-up was suggested by the radiographic reports. Dr. Margolies asserts that the sole proximate cause, if any, of Marsha's injury was the radiologist.

A judgment notwithstanding the verdict is to be entered only when the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could ever stand based on the evidence. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). "In making this assessment, a reviewing court must not substitute its judgment for the jury's, nor may a reviewing court reweigh the evidence or determine the credibility of witnesses." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 89 (2002). We review *de novo* motions for judgment notwithstanding the verdict. *York*, 222 Ill. 2d at 178.

A motion for a new trial should be granted where the jury's verdict is against the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on any of the evidence. *Maple*, 151 Ill. 2d at 455. The decision whether to grant a new trial is a matter within the sound discretion of the trial court; thus, we will not reverse its ruling absent an abuse of discretion. *Maple*, 151 Ill. 2d at 455. Abuse of discretion occurs if no reasonable person would take the view adopted by the trial court. *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 912 (2007).

In order to prevail in a medical negligence case, the plaintiff must prove: (1) the proper standard of care against which the defendant's conduct is measured; (2) a deviation from the applicable standard of care; and (3) a resulting injury proximately caused by the defendant's want of skill or care. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). Unless the negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert testimony is required to establish the standard of care. *Garley v. Columbia LaGrange Memorial Hospital*, 351 Ill. App. 3d 398, 404-05 (2004).

The medical evidence presented during the two-week trial was as follows.

Dr. William Matviuw, an obstetrician-gynecologist, opined that the standard of care for a treating gynecologist in 1998 and 1999 required Dr. Margolies to refer Marsha Dienstag for a surgical consultation and to discontinue her hormone replacement therapy (*i.e.*, prescription

estrogen). Dr. Matviuw based these opinions on Marsha's family history of cancer and the atypical ductal hyperplasia that was revealed in her 1991 biopsy. Dr. Matviuw testified that atypical ductal hyperplasia can be a precursor to cancer and requires close observation. Although neither the 1998 nor the 1999 mammogram indicated radiographic evidence of malignancy, both reports indicated that the tissue density could reduce the sensitivity of the mammogram and both mammograms showed new densities. Dr. Matviuw opined that a surgical consultation was called for, based on the mammogram reports in 1998 and 1999, because the reports showed new densities and Marsha's history placed her at high risk for developing a malignancy. In 1999, the standard of care required Dr. Margolies to refer Marsha to a general surgeon for consultation because the ultrasound recommended by the radiologist showed that the density was not liquid and therefore not a cyst. Dr. Matviuw testified that only a biopsy could identify the new density. Dr. Matviuw also opined that it was a breach of the standard of care for Dr. Margolies to fail to discontinue Marsha's estrogen treatment because it can act as an accelerant to breast cancer. Since Marsha was at high risk of developing a malignancy, Dr. Margolies should have discontinued estrogen therapy when the 1998 and 1999 mammograms indicated a new density in her left breast.

On cross-examination, Dr. Matviuw acknowledged that a density is not a mass and that he misstated that Marsha's 1991 biopsy and the 2000 diagnosis of cancer were in the same location on her breast. Dr. Matviuw also acknowledged that in his deposition he had withdrawn his opinion that estrogen was in fact an accelerant in the development of Marsha's cancer, but testified that it was likely a contributing factor in the development of the tumor. Dr. Matviuw also admitted that Marsha's family history, with one generation removed (grandmother and aunt), put her at lower risk for developing cancer than if it had been first generation.

Dr. Lawrence Hollander, a general surgeon, gave causation testimony. If Marsha had been referred to a general surgeon in 1998 or 1999, the surgeon would have discovered her family history and her previous biopsy, would have asked if she was taking any hormone prescriptions (*i.e.*, estrogen, progesterone, or birth control), and would have performed a biopsy. Dr. Hollander testified that ultrasounds are designed to differentiate between densities that are solid as opposed to liquid filled. Since Marsha's 1999 ultrasound indicated that the density in her left breast was not liquid filled (cyst), Dr. Hollander opined that a surgeon who was presented with that information would have performed a biopsy to determine of what the density consisted. Dr. Hollander testified that if a surgeon reviews a radiologist's report that

assesses a density as "probably benign," the surgeon would interpret that assessment to mean "possibly malignant," thereby requiring a biopsy. Dr. Hollander further opined that had Marsha had a biopsy in 1998 or 1999, the cancer would have been Stage I because there was not yet a palpable mass in either 1998 or July 1999. Dr. Hollander testified that if the cancer had been diagnosed in either 1998 or 1999 when it was Stage I, the survival rate would have been 90% to 95%, but at Stage III it was only 40%. If her cancer had been diagnosed in 1998 or 1999, then Marsha would not have had to undergo the radical mastectomy, reconstructive surgery, and extensive radiation. Dr. Hollander opined that Marsha would have had a lumpectomy instead and would not have suffered lymphedema, "skin burn," and other radiation side-effects because the radiation would have been administered differently. She also would have been spared many of the side-effects of the chemotherapy because she would have had fewer medications.

On cross-examination, Dr. Hollander acknowledged that he is a general surgeon and not an oncological surgeon. He also acknowledged that in 1998 and 1999 there was no radiographic evidence of malignancy. Dr. Hollander testified on cross-examination that although atypia on a pathological report such as Marsha's biopsy report from 1991 does not mean that a patient will get cancer, it is a warning to clinicians that cells are "headed in a bad direction" because atypia is a premalignant lesion. Dr. Hollander further testified on cross-examination that a radiologist's report that states "no cysts and no masses" does not identify the mammographic abnormality.

Defendant's retained expert obstetrician-gynecologist, Dr. Andrew Roth, testified that Dr. Margolies complied with the standard of care. Dr. Roth opined that none of Marsha's medical records, prior to her diagnosis of cancer in 2000, revealed any clinical evidence of malignancy. According to Dr. Roth it was within the standard of care for Dr. Margolies to rely on the radiologist's reports and follow the radiologist's recommended follow-up care. Dr. Roth opined that the changes in Marsha's mammogram reports were not worrisome. In 1999, when the radiologist's report on Marsha's mammogram indicated a follow-up ultrasound, Dr. Margolies ordered the ultrasound. Dr. Roth opined that the ultrasound report indicating "no mass or cysts" was not alarming and that Dr. Margolies complied with the standard of care by following up as the radiologist recommended. Dr. Roth further opined that estrogen did not play a role in the growth of Marsha's cancer based on diagnostic tests performed in 2000 on tissue from Marsha's biopsy, which were positive for breast cancer but were negative for hormone involvement.

Dr. Bruce Silver, defendant's retained expert diagnostic radiologist, also testified on behalf of Dr. Margolies. Dr. Silver opined that there was nothing in either the 1998 or 1999 mammogram report that gave any indication of malignancy. He testified that "dense" tissue does not refer to a "mass." Dr. Silver described the 1998 mammogram as "normal" and stated that a recommendation of routine screening in one year was an appropriate and typical response to a normal mammogram. Dr. Silver further testified that the ultrasound recommendation following the 1999 mammogram was the appropriate response where the 1999 mammogram indicated probably benign cysts or fibroadenoma. Dr. Silver reviewed the ultrasound report and testified that nothing therein showed any malignancy; no masses or cysts were found. Dr. Silver testified that it was reasonable for Dr. Margolies to rely on the radiologist's reports and recommendations for follow-up care. According to Dr. Silver, in this case, the reports did not indicate any malignancy and did not necessitate a biopsy since both the mammograms and the ultrasound were "negative."

Dr. Margolies was called to testify adversely and on his own behalf. Dr. Margolies testified that he had been treating Marsha since the mid-1980s and that he was aware she had dense breast tissue. Dr. Margolies opined that fibrocystic changes in breast tissue or increased density did not indicate a surgical consultation. He testified that he ordered annual routine mammograms for Marsha and that he followed the radiologist's recommendations and findings. Dr. Margolies further testified that in 1991 when Marsha's mammogram indicated a need for surgical consultation, he referred her to a surgeon. He testified that in 1999 when the radiologist's report on Marsha's mammogram recommended an ultrasound, he ordered it. Dr. Margolies further testified that he followed the radiologist's assessment that there was no radiographic evidence of malignancy, the findings were probably benign, and to follow up in one year.

Dr. Margolies testified that Marsha's medical records did not show any clinical signs of malignancy until May 2000, when a lump was palpable. Upon finding the palpable lump in May 2000, Dr. Margolies ordered a mammogram and surgical consultation. He further testified that, contrary to Marsha's assertion, his records from November 1999 indicated that she did not have a palpable lump at that time, and he ordered the appropriate follow-up physical exam six months from that visit. With respect to the prescription of estrogen, Dr. Margolies testified that he initially prescribed it to relieve Marsha's symptoms of menopause and continued on that course of treatment because there was no clear evidence at that time that estrogen had any effect on breast cancer.

Marsha's treating oncologist, Dr. Douglas Merkel, testified for defendant. His records indicated that Marsha's first questionable mammogram was in 1999, but, at the time, her ultrasound and physical examination were not suspicious and it was only subsequent to that evaluation that Marsha became aware of an enlarging mass. Dr. Merkel further testified that clinicians rely on radiologist reports and integrate that information with knowledge about the patient. Dr. Merkel also testified that the best way to detect breast cancer is regular physical examinations and mammograms.

■ Thus, the lengthy trial record shows that both parties offered conflicting expert testimony relating to the proper standard of care and defendant's alleged breach thereof. The conflicting testimony was sufficient to raise a question of fact to be decided by the jury, and this court will not substitute its judgment for that of the jury and reweigh the credibility of the witnesses. See *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 622-23 (2007); *Schiff v. Friberg*, 331 Ill. App. 3d 643, 657 (2002). The weight to be given to expert testimony is for the trier of fact. *Walski v. Tiesenga*, 72 Ill. 2d 249, 260 (1978). Notably, the jury was instructed on sole proximate cause and chose not to believe Dr. Margolies' defense that the radiologist provided inaccurate information or misinformation that delayed Marsha's diagnosis. A jury is not bound to accept the opinion of an expert on an ultimate issue. *Piano v. Davison*, 157 Ill. App. 3d 649, 676 (1987). A jury is free to disregard an expert witness's conclusions of fact. *Piano*, 157 Ill. App. 3d at 676. Based on the medical testimony, the jury was presented with evidence of each element of medical negligence. See *Sullivan*, 209 Ill. 2d at 112. We will not set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because a different result is more reasonable. *Maple*, 151 Ill. 2d at 453. Therefore, we conclude that the evidence does not so overwhelmingly favor Dr. Margolies that no contrary verdict could ever stand. We also conclude that a new trial is not warranted where the jury verdict was not arbitrary and was based on evidence presented at trial.

## B. *Damages*

Next, Dr. Margolies contends that he is entitled to a new trial solely on damages. He contends that the jury verdict is against the manifest weight of the evidence and resulted from improper, prejudicial argument by plaintiffs' counsel regarding Marsha's lost wages. Alternatively, Dr. Margolies seeks further remittitur of the damage award. Dr. Margolies asserts that there was no evidence presented to support any lost wages for Marsha or any loss of services award for Gary Dienstag. Dr. Margolies also asserted that the appropriate

measure of recurrence was 2.5% not 13% as calculated on the jury verdict form.

The determination of the amount of damages is a function reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). A jury's award will not be subject to remittitur if it falls within the flexible range of conclusions reasonably supported by the facts. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992). A verdict will not be set aside by a court " 'unless it is so excessive as to indicate that the jury was moved by passion or prejudice, or that it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience.' " *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 171 (2003), quoting *Richter v. Northwestern Memorial Hospital*, 177 Ill. App. 3d 247, 256-57 (1988).

■ In the present case, the jury awarded a total of $5,950,000. The trial court granted in part Dr. Margolies' posttrial motion for remittitur and reduced the total award to $5,450,000. The damages, as remitted, were itemized as follows: for Marsha Dienstag: disfigurement $1 million; pain and suffering $2 million; medical expenses $325,000; possibility of cancer recurrence $650,000; loss of normal life $1,275,000; lost salaries and benefits $50,000. The jury also awarded damages to Gary Dienstag of $300,000 (loss of society and companionship $100,000; loss of services $200,000), which were reduced to $150,000.

Despite the remittitur that was granted, Dr. Margolies seeks further remittitur to the $1 million limit of his insurance policy or a new trial on damages. There was ample testimony from Marsha and her treating physicians, Dr. Merkel and Dr. Vathsala Raghavan, regarding medical expenses, pain and suffering, and disfigurement. Marsha's medical bills were testified to as fair and reasonable, and Dr. Margolies does not dispute this in his appeal. Dr. Merkel detailed testimony as Marsha's treating oncologist regarding her postoperative treatment, which supports the award for pain and suffering. He testified that Marsha underwent 24 weeks of chemotherapy, as well as 5 to 6 weeks of radiation 5 days a week. The side-effects of the treatment were hair loss, nausea, fatigue, skin rashes, numbness in her hands, and lymphedema. Dr. Merkel also testified that Marsha suffered from depression likely caused by the diagnosis of cancer and the subsequent treatment. Dr. Raghavan testified that due to the size of the tumor and the fact that Marsha had a mastectomy, she had to undergo radiation in the chest wall and axillary area. Marsha described in detail the painful three-hour to four-hour surgery to remove her left breast and

some lymph nodes. She testified that she begged the surgeon to take her right breast too, so she would not have to go through the "horrific experience" again. Marsha described having the prosthetic, then having her breast reconstructed, and not having any feeling in the new breast.

There was also evidence to support the risk of recurrence that was listed on the verdict form as 13% and used by the jury to calculate damages based on the risk of recurrence. Dr. Merkel testified that the risk of recurrence in the first five years was 27%, or 5.5% per year, and after five years the risk of recurrence dropped by half to 13.5% for years 5 to 10, or 2.5% per year. Therefore, there was a basis in evidence that after five years survival, the risk of recurrence of cancer was in the range of 13%. See *Gill v. Foster*, 232 Ill. App. 3d 768, 791 (1992) ("in proving damages, the plaintiff has the burden to establish a reasonable basis for computing the damages").

Dr. Margolies argues that plaintiffs' counsel improperly argued during closing argument that Marsha's inability to teach was part of loss of normal life. A review of the record shows that plaintiffs' counsel merely listed teaching or grading papers as possibilities among many examples of things people might enjoy doing that would be a loss if they were no longer able to pursue those activities. Defendant did not object at trial to this line of argument. To preserve a trial error for review on appeal, a party must make a timely objection. *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 10 (2004). Nevertheless, the trial court granted in part Dr. Margolies' posttrial motion and reduced the award for loss of normal life by $100,000 because plaintiffs suggested that Marsha lost the ability to teach when there was testimony to the contrary.

Defendant further contends that there was insufficient evidence to support the $1,275,000 award for loss of normal life because Marsha did not testify to the extent to which she sewed or rode a bicycle or cooked before her injury. However, Marsha did testify to various ways her life had changed; for example, that she was tired all the time and when she was working she would just get home and "collapse," that she has trouble sleeping, and that because she has no strength in her hands from the lymphedema, she can no longer sew or ride a bicycle or cook. Marsha's husband Gary testified that their personal life has changed in drastic ways and has never been the same. Gary also testified that they were severely restricted in what they could do socially because Marsha did not want to go out in public. Based on this testimony, the jury's award for loss of a normal life does not shock the conscience, and any influence the remark by plaintiffs' counsel about teaching may have had on the jury was cured by the remittitur. See *Buckholtz*, 337 Ill. App. 3d at 171.

The jury awarded $300,000 for lost wages. That figure was not supported by the evidence and the trial court reduced the award to $50,000. There was no testimony that cancer prevented Marsha from teaching. Indeed, she worked the entire duration of her treatment, albeit part-time, and continued to teach for two years following her diagnosis. The only indication that Marsha's illness interfered at all with her teaching was her testimony that she took time off for a brief period following her mastectomy and then her breast reconstruction surgery. The trial court properly instructed the jury to disregard plaintiffs' counsel's argument regarding lost wages. See *Tabe v. Ausman*, 388 Ill. App. 3d 398, 408 (2009), citing *Bulleri v. Chicago Transit Authority*, 41 Ill. App. 2d 95, 104 (1963) (holding closing arguments that are unsupported by the evidence are improper). There was evidence in the record that Marsha was earning $30,000 annually as a teacher. Thus, there was evidence of some lost wages for the time she spent recuperating from surgery as well as reducing her teaching to part-time. See *Lee*, 152 Ill. 2d at 470.

Dr. Margolies also argues that the award to Gary Dienstag was against the manifest weight of the evidence. Dr. Margolies contends that Gary never testified to any loss of services and testified that, rather than giving his wife support, she gave him support and made him a better person. We disagree. Gary's testimony that his wife gave him support during her illness was a reference to what he perceived as her fortitude and was not an implication that he suffered no loss of consortium. Gary testified that his relationship with his wife had been impaired by her illness. He described the interruption to their personal lives as "drastic" and that it has never been the same. The trial court reduced the jury award from $300,000 to $150,000. We find the reduced award within the reasonable limits of compensation for Gary Dienstag's loss. See *Lee*, 152 Ill. 2d at 470.

### C. *New Trial Based on Counsel's Arguments and Witness Commentary*

Next, Dr. Margolies argues that he was denied a fair trial and is entitled to a new one because plaintiffs' counsel and witnesses repeatedly offered erroneous statements. Dr. Margolies argues that Dr. Matviuw improperly referred to plaintiffs' counsel as "Dr. Chessick." Plaintiffs' counsel is also a medical doctor and the trial court granted defendant's motion *in limine* prohibiting reference to plaintiffs' counsel as "Dr. Chessick." The trial court reminded the witness to refrain from referring to plaintiffs' counsel as "doctor," and defendant moved for a mistrial, which the court denied.

A trial court has broad discretion to determine the propriety of declaring a mistrial. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 534 (2000). Errors that occur through violation of a motion *in limine* are grounds for a mistrial only where they prejudiced the complaining party. *McDonnell*, 192 Ill. 2d at 535. Here, the record shows that the error occurred only once, was inadvertent, and was part of lengthy and complex proceedings. The trial court suggested instructing the jury to disregard, but defendant declined the instruction. Therefore, nothing in the record suggests that Dr. Margolies was prejudiced by the single comment.

Dr. Margolies contends that it was error for the trial court to overrule his objection to testimony elicited from Marsha regarding Dr. Margolies' alleged failure to inform or advise her of risk factors for cancer since their were no allegations of a failure to inform or advise. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 34 (2003). Moreover, a party is not entitled to a reversal based upon rulings on evidence unless the error was substantially prejudicial and affected the outcome of the trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002). Here, Dr. Margolies fails to meet his burden because he does not explain how he was prejudiced or in what way this testimony affected the outcome of the trial, and thus, reversal is not warranted on this basis. See *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991) (the burden is on the party seeking reversal to establish prejudice).

Next, Dr. Margolies contends that the following conduct by plaintiffs' counsel deprived him of a fair trial even though the court sustained his objections and instructed the jury to disregard: that plaintiffs' counsel repeatedly violated the trial court's rulings sustaining objections to cross-examination of Dr. Margolies regarding second opinions concerning the use of estrogen; that during his adverse examination, plaintiffs' counsel accused him of altering his records to show that on May 4, 2000, he referred Marsha to a surgeon; that plaintiffs' counsel again argued in closing that Dr. Margolies altered his records, yet defendant did not object to the comments during closing; that plaintiffs' counsel improperly argued in closing to the jury the method of calculating Marsha's risk of cancer recurrence; and that in closing argument plaintiffs' counsel improperly argued that Marsha was entitled to recover for loss of normal life and lost wages because she could not work.

Dr. Margolies does not explain how he was prejudiced by these alleged errors. See *Cairns v. Hansen*, 170 Ill. App. 3d 505, 511 (1988). Defendant's timely objections, sustained by the trial court, kept any

offensive testimony from the jury. The jury is presumed to follow the trial court's instructions. *Beard v. Barron*, 379 Ill. App. 3d 1, 11 (2008), citing *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Consequently, any error that may have occurred was cured.

Further, Dr. Margolies contends that plaintiffs' counsel engaged in "tactical gamesmanship" by making the following personal attacks during his closing argument. Counsel suggested that Dr. Margolies must be "learning disabled"; implied that he was "stupid," a "lone wolf," or "nuts"; and accused Dr. Margolies of betting with plaintiff's life and suggested he was "selling" something to the jury. Plaintiffs' counsel referred to defendant's experts as "dudes" and compared them to the parable of the blind man feeling the tail of an elephant and concluding it is a donkey.

Defendant did not object to any of the complained-of statements or inferences during the closing argument. Where a party fails to make an appropriate objection in the court below, he has failed to preserve the question for review and the issue is waived. *York*, 353 Ill. App. 3d at 10. Therefore, Dr. Margolies waived the issue of improper statements during closing argument because he failed to object at the time the comments were made. See *Sramek v. Logan*, 36 Ill. App. 3d 471, 473 (1976) (finding a claim of error surrounding comments in closing argument waived when not objected to as the comments were made).

## D. *New Trial Based on Evidentiary Errors*

Lastly, Dr. Margolies argues that he is entitled to a new trial because various evidentiary rulings by the trial court deprived him of a fair trial. First, Dr. Margolies asserts that the trial court erred in allowing questioning of Dr. Merkel regarding certain medical literature. Second, Dr. Margolies argues it was reversible error for counsel to read from scientific work not in the record, although defendant admits plaintiffs' counsel did not read from the scientific journal but instead attempted to question Dr. Merkel about various articles.

Plaintiffs' counsel attempted to question Dr. Merkel regarding several articles published in medical journals between the mid-1970s and the 1980s regarding the risk "dense breasts" posed to developing breast cancer. Defendant objected to this line of questioning and the trial court allowed the questions for the purpose of refreshing his memory as to whether "dense breasts" was a factor. A review of Dr. Merkel's testimony reveals that Dr. Merkel was not familiar with the articles to which plaintiffs' counsel was referring. Indeed, he testified that he was not even a physician when some of the articles were published and stated that he "wasn't prepared for this topic." Notably,

Dr. Merkel testified in plaintiffs' case-in-chief; thus, it appeared that plaintiffs' own witness was unprepared, belying Dr. Margolies' assertion that he was in some manner prejudiced by this line of questioning. Furthermore, the trial court instructed the jury that 1998 and 1999 were the relevant time periods, and to disregard any reference to standard of care outside that time frame. Therefore, the trial court cured any potential prejudice resulting from this line of questioning by instructing the jury as well as by defendant's opportunity to cross-examine the witness on this issue. See *Ruffin v. Boler*, 384 Ill. App. 3d 7, 26 (2008).

Finally, Dr. Margolies contends it was error for the court to allow plaintiff to elicit testimony from Dr. Hollander about how he would interpret the mammogram reports because that constituted standard of care testimony and Dr. Hollander was only qualified to give causation testimony. A review of the record reveals that Dr. Hollander's testimony concerned what a general surgeon would do under similar circumstances if presented with mammogram reports such as Marsha's. Dr. Hollander did not testify as to what a gynecologist should have done in a similar situation. His testimony referred to causation; *i.e.*, if Dr. Margolies had referred Marsha to a surgeon following either her 1998 or her 1999 mammograms, then the surgeon would have examined her, biopsied the tissue, diagnosed the cancer sooner and she would not have had such invasive surgery or such extensive chemotherapy and radiation. See *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 110 (1997). Therefore, the admission of Dr. Hollander's testimony was not an abuse of the trial court's discretion. See *Snelson*, 204 Ill. 2d at 34.

Moreover, not every alleged error requires reversal. "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002). Since none of these alleged errors appears to have prejudiced Dr. Margolies or affected the outcome below, we also find that reversal is not warranted on this basis.

## CONCLUSION

Based on all of the foregoing, we affirm the judgment of the trial court.

MURPHY, P.J., and STEELE, J., concur.