# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Choate v. Indiana Harbor Belt R.R. Co.*, 2011 IL App (1st) 100209

---

| | |
|---|---|
| Appellate Court Caption | DOMINIC CHOATE, Plaintiff-Appellee, v. INDIANA HARBOR BELT RAILROAD COMPANY, an Indiana Corporation; THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY, an Illinois Corporation; and CSX TRANSPORTATION, INC., a Virginia Corporation, Defendants-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1–10–0209 |
| Filed | June 27, 2011 |
| Modified on denial of rehearing | August 1, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant railroad's motion for judgment *n.o.v.* was properly denied in an action for the injuries the minor plaintiff suffered when his attempt to jump aboard a slow-moving freight train ended with the loss of his leg below his knee, notwithstanding the railroad's contention that attempting to jump aboard the train was an open and obvious danger for which the railroad owed plaintiff no duty, since the evidence did not so overwhelmingly favor defendant that no contrary verdict could stand, there was conflicting evidence as to whether plaintiff subjectively appreciated the danger, and the evidence as to whether proposed improvements to the right-of-way would have prevented plaintiff's injuries did not overwhelmingly favor the railroad. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03–L–12237; the Hon. William J. Haddad, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Fedota Childers, P.C. (David R. Schmidt and George H. Brandt, of counsel), Mayer Brown, LLP (Michele Odorizzi, of counsel), both of Chicago, and Mayer Brown, LLP, of Washington, D.C. (Evan M. Tager and Brian J. Wong, of counsel), for appellants.

Hall Prangle & Schoonveld, LLC, of Chicago (Hugh C. Griffin, of counsel), Sandberg Phoenix & von Gontard, PC, of Edwardsville (Philip J. Lading, A. Courtney Cox, and Anthony L. Martin, of counsel), Association of American Railroads (Louis P. Warchot and Daniel Saphire, of counsel), Shook Hardy & Bacon, LLP (Mark A. Behrens and Christopher E. Appel, of counsel), Washington Legal Foundation (Daniel J. Popeo and Richard A. Samp, of counsel), all of Washington, D.C., for *amici curiae*.

Brustin & Lundblad, Ltd. (Leslie J. Rosen, of counsel), Law Offices of Leslie J. Rosen (Leslie J. Rosen, of counsel), both of Chicago, for appellees.

Rubin Machado & Rosenblum, Ltd., of Chicago (Richard J. Rosenblum, of counsel), for *amicus curiae*.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Hall and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1 Minor-plaintiff,[1] Dominic Choate, by Vickie Choate, his mother and next friend, and Vickie Choate, individually, brought a negligence action against defendants, Indiana Harbor Belt Railroad Company (IHB), the Baltimore and Ohio Chicago Terminal Railroad Company (B&OCT), and CSX Transportation, Inc. (CSX), to recover damages for personal injuries plaintiff suffered while attempting to jump aboard a moving freight train traveling 9 to 10 miles per hour. The jury returned a verdict in favor of plaintiff in the amount of $6.5 million, which it reduced to $3.9 million after finding that plaintiff was 40% comparatively negligent. On appeal, defendants contend the circuit court erred by: (1) denying their motion for

---

[1]Plaintiff was 18 years old at the time of trial and had reached the age of majority.

judgment notwithstanding the verdict because plaintiff's attempt to jump aboard a moving freight train constituted an open and obvious danger for which defendants owed the minor plaintiff no duty, and because plaintiff failed to present competent evidence of remedial measures defendants reasonably could have implemented that would have prevented plaintiff from jumping aboard the moving freight train; (2) failing to give effect to an allegedly binding judicial admission made by plaintiff as to his subjective appreciation of the danger involved in jumping on a moving freight train; (3) refusing to give a special interrogatory asking the jury whether plaintiff appreciated at the time he was injured that attempting to jump on a moving freight train presented a risk of harm to him; (4) excluding testimony of plaintiff's companions that they recognized that jumping onto a moving freight train was dangerous, while at the same time allowing plaintiff to introduce evidence that other minors had attempted to jump on moving freight trains; (5) allowing plaintiff's expert witness to offer conclusions lacking a factual foundation and to opine on issues outside the scope of his expertise; (6) admitting certain testimony from a special agent of the IHB police department that was irrelevant and beyond his level of expertise; (7) admitting the school psychologist's testimony regarding plaintiff's low-average intelligence; and (8) allowing plaintiff to cross-examine defendants' engineering expert using a photograph for which no foundation was established. Defendants also contend they are entitled to a new trial because the verdict was against the manifest weight of the evidence. We affirm.

¶ 2        While attempting to jump aboard a moving freight train which was traveling 9 to 10 miles per hour, plaintiff fell on the tracks and the train ran over his left foot, necessitating amputation of his left leg below his knee. Plaintiff filed suit against defendants, alleging that they owned, operated, managed, maintained and controlled the train tracks where he was injured and that they failed to adequately fence the area or otherwise prevent minor children from accessing the tracks or warn them of the danger. The circuit court initially granted summary judgment in favor of defendants, finding from plaintiff's deposition testimony that he had subjectively appreciated the danger of jumping aboard the moving freight train and therefore defendants owed him no duty of care. Plaintiff subsequently filed a motion to reconsider that the circuit court granted, finding that an objective standard applied as to whether the danger of jumping aboard a moving freight train was so obvious as to negate any duty owed by defendants. Finding that this should be a question of fact for the jury, the circuit court vacated the earlier order granting summary judgment in favor of defendants. The cause proceeded to trial.

¶ 3        Evidence at trial established the following facts. In July 2003, plaintiff was 12 years and 9 months old and had finished the sixth grade. Dr. Richard Lencki, a school psychologist, testified he performed individual intelligence testing on plaintiff in January 2003 during the sixth grade school year. The testing showed that plaintiff had a full scale IQ of 83, which was a "low-average" score in the 13th percentile, meaning that 87% of children his age scored higher than him. Dr. Lencki specifically determined that plaintiff was not mentally retarded. Plaintiff could read at a fifth grade level and his math reasoning skills were at a fourth grade level. Plaintiff was capable of meeting his sixth grade requirements and he had received supplemental educational services to help him do so.

¶ 4        On July 30, 2003, plaintiff and his friends Charlie Spindler, Steve Weyer, Alisa Van

Witzenburg, Jessica Gunderson and Brittany Edgar gathered at the parking lot of an apartment building at 5810 West 107th Court Way in Chicago Ridge, Illinois. Three railroad tracks run in a northwest-southeast direction behind the parking lot. Defendant CSX owns the tracks, while defendant IHB patrols the right-of-way. Defendant B&OCT is wholly owned by CSX.

¶ 5    Looking north from the parking lot, one sees a chain-link fence around a portion of the tracks; the fence does not extend all the way around the tracks. There is a sign mounted on the fence near where it ends, which reads:

"DANGER

NO

TRESPASSING

NO

DUMPING"

Plaintiff testified he did not see this sign on July 30, 2003. Another fence is on the other side of the tracks. That fence had a hole in it and was rolled back so that people could walk through it to get to the tracks.

¶ 6    Plaintiff was scooting his bicycle around the parking lot, about 50 feet from the railroad tracks, and talking to his friends when an eastbound freight train appeared on the middle of the three tracks. Plaintiff testified that the train's speed was 9 to 10 miles per hour and that the train kept going at a steady speed and never stopped. Alisa, Brittany, and Jessica testified that they thought the train might have been stopped for part of the time, but they all agreed that the train was moving at the time plaintiff was injured. Brittany testified that the train was moving "slow."

¶ 7    Plaintiff testified that after a couple of minutes, he, Charlie, and Steve began walking toward the tracks. They stepped onto the railroad right-of-way, defined as "the track or roadbed owned, leased, or operated by a rail carrier which is located on either side of its tracks and which is readily recognizable to a reasonable person as being railroad property or is reasonably identified as such by fencing or appropriate signs." 625 ILCS 5/18c–7503(3) (West 2002). Under the Illinois Vehicle Code, no unauthorized person is permitted to "walk, ride, drive or be upon or along the right of way or rail yard of a rail carrier within the State, at a place other than a public crossing." 625 ILCS 5/18c–7503(1)(a)(i) (West 2002). The parties agree that plaintiff and his companions were trespassers as soon as they stepped onto the railroad right-of-way.

¶ 8    Plaintiff testified their original intention was to wait for the train to pass and then cross the tracks to visit Steve's house on the other side. Alisa similarly testified to plaintiff's, Charlie's, and Steve's original intent to cross the tracks to reach Steve's house. Alisa further testified that they did not want to walk around the train because it would take them a half-hour to do so.

¶ 9    Plaintiff testified that while the train was blocking their path across the tracks, he and Charlie decided on the spur-of-the-moment to jump onto the train. Plaintiff testified that Charlie tried first by attempting to grab onto the ladder on the side of the train. Charlie was

-4-

unsuccessful in his attempt and stepped away from the train. Plaintiff then attempted to grab hold of the ladder. Plaintiff testified his motivation in doing so was to impress Alisa, whom he was dating at that time. Plaintiff had never before attempted to jump aboard a moving train, nor had he seen anyone successfully do so.

¶ 10     Plaintiff testified he made three attempts to jump on the train. Brittany testified she and the other girls yelled at plaintiff to stay away from the train, but plaintiff testified he never heard the warning because the train was so loud that it was hard to hear. Plaintiff testified that on his first attempt, he stood flat-footed on the ground and did not run along the side of the train. Although plaintiff was only about 4 feet 10 inches tall at the time, he was able to touch the bottom rung of the ladder. In attempting to "cup" his hand around the rung of the ladder, two of his fingers were bent backwards and he was forced to pull his hand back. Plaintiff testified that the bending of his fingers did not cause him any pain.

¶ 11     Plaintiff testified that on his second attempt, he ran alongside the train and grabbed the ladder. However, his shoes began slipping on the rocks, and so he was again forced to let go. Plaintiff testified that as he was running, he was able to keep up with the train and that, "if [he had] wanted to, [he] would have been able to pass the ladder that [he] was initially trying to get onto."

¶ 12     Plaintiff testified that on his third attempt, he grabbed hold of the ladder with both hands and pulled his body up. His right foot stepped onto the ladder. Plaintiff testified he does not recall what happened next; his next memory is of waking up on the rocks. Plaintiff tried to stand up, but his knee bent backwards and he fell back to the ground. Plaintiff looked down and saw that his left foot had been severed. Alisa testified that plaintiff's injury occurred during his third attempt to jump on the train. Alisa stated that during that attempt, plaintiff slipped off and his left foot went under the train's wheel.

¶ 13     Plaintiff testified that a man named Austin came over to help him, and then an ambulance arrived and took him to the hospital. Surgeons amputated his left leg "a couple inches below [his] knee."

¶ 14     Austin Patton testified that on July 30, 2003, he walked out the back door of his apartment at 5818 107th Court Way in Chicago Ridge and saw a group of grade-school boys and girls in the parking lot. Two boys were standing in a grassy area near the train tracks. A freight train traveling about 10 miles per hour was going by on the second track. Mr. Patton yelled at the boys to stay away from the tracks, but the train was so loud that they could not hear him. The boys approached the train and one of the boys tried to grab onto a ladder on the side of the train. He was knocked down, after which he made no further attempt to grab hold of the ladder. The other boy (whom he later identified as plaintiff) gripped onto the ladder and was pulled to the right. Plaintiff lost his grip, fell down, and the train ran over his foot. As a result, plaintiff "lost the tip of his foot at an angle." Mr. Patton ran over, pulled plaintiff off the tracks and put a towel over his leg, and told a nearby person to call 911. He also flagged down a nearby ambulance. Mr. Patton also testified that prior to July 30, 2003, he had seen children alongside the railroad tracks all the time, and he had observed children cross the railroad tracks in both directions.

¶ 15     Steve Trnka, a firefighter/paramedic employed by Chicago Ridge, testified he had lived

in Chicago Ridge until he was 18 years old, and during that time he had at least twice crossed the tracks where plaintiff was injured. When he was in high school in the 1980s, it was a pretty common occurrence for children to cross the tracks. Mr. Trnka testified that on July 30, 2003, he arrived at the scene shortly after 5:30 p.m. and saw that plaintiff's foot had been severed. Mr. Trnka gave plaintiff oxygen, started an IV, and provided him with nitrous oxide. Mr. Trnka then drove plaintiff to the hospital.

¶ 16    Plaintiff testified he had crossed the railroad tracks at 107th Street one time prior to July 30, 2003. Also, in November 2002, plaintiff had been stopped by IHB police for being on railroad property near Austin Avenue in Chicago Ridge. The officer warned plaintiff that he could get hurt on railroad property and his mother also lectured him to stay away from railroad trains and tracks. Plaintiff further testified that his mother had warned him over a dozen times prior to July 30, 2003, that he should stay away from railroad trains and railroad tracks.

¶ 17    Plaintiff's mother, Vickie Choate, testified she received a letter from the IHB police sometime between 1998 and 2000, informing her that plaintiff had been discovered on the railroad tracks. In response, Ms. Choate warned plaintiff to stay away from trains or otherwise he was going to get hurt. Ms. Choate testified she had warned plaintiff against being around trains on other occasions and had told him he could get hurt by a train and that somebody she knew from her childhood had lost both of his legs from a train accident. Plaintiff testified, though, that although his mother warned him that railroad trains and tracks were dangerous, she never told him he could get killed or that he could lose an arm or a leg as a result of a train accident. Plaintiff denied that his mother gave him graphic warnings about how badly he might be hurt by a train accident.

¶ 18    Plaintiff testified he agreed that the definition of "dangerous" is "something that could kill you or take a body part." Plaintiff agreed that, by this definition, his attempt to board a moving freight train traveling 9 to 10 miles per hour was a dangerous thing to do. However, plaintiff testified that at the time he was attempting to board the moving train, he did not know he was doing something dangerous; he only knew it was dangerous after he had been injured. Plaintiff testified that as he was attempting to jump on the train, he thought he "was going to get on the train, ride it for a couple of feet, and then [he] was going to get off, and everything would be fine."

¶ 19    Plaintiff's answers to deposition questions regarding his recognition of the dangerousness of the train and train tracks were admitted for impeachment purposes. We will discuss those questions and answers in detail later in this opinion.

¶ 20    Victor Barks testified he is the chief of the IHB police department, which patrols IHB property to prevent theft and vandalism. IHB established a "three strikes" program whereby if an officer saw a pedestrian on railroad property outside of a designated crossing area, the officer filled out a contact card and contacted the pedestrian's parents by letter if he was younger than 18 years of age. In a given year, IHB officers wrote out over 1,000 contact cards. If the pedestrian under the age of 18 was caught a second time on railroad property outside of a designated crossing area, the IHB police called the parents and sent them a second letter. If the same pedestrian was caught committing a third such violation, a police

officer from the village or city where the violation occurred then wrote up a citation and the pedestrian was required to "go into the court system." Chicago Ridge was one of the villages that participated in IHB's three strikes program.

¶ 21 Charles Rice, a former special agent for the IHB police department, testified that pursuant to the three strikes program, a contact card for plaintiff was filled out on November 7, 2002. The contact card stated that plaintiff was on the service road just west of Austin Avenue and that he had been warned and released. Mr. Rice testified that a letter would have been sent to plaintiff's parents informing them that plaintiff had been found on railroad property.

¶ 22 James Griffith, a special agent for the IHB police department, testified he initiated the Operation Lifesaver program, whereby he visited schools within walking distance of the railroad and talked to boys and girls about railroad safety. Pursuant to the Operation Lifesaver program, Mr. Griffith visited schools in Chicago Ridge and informed the kids that they should not trespass on railroad property or jump on or cross through trains. Mr. Griffith testified that pursuant to the three strikes program, he had filled out contact cards for children he had observed crossing through a standing train in the general area where plaintiff was injured. Mr. Griffith had stopped and warned children under the age of 13 for catching rides on trains. Over the years, Mr. Griffith had seen approximately 50 children catching such rides on trains.

¶ 23 Plaintiff's expert, Dr. William Berg, Ph.D., testified to what defendants reasonably could have done to prevent plaintiff from being injured. Dr. Berg first explained he had received a Ph.D. in civil engineering from the University of Illinois and had been a professor of civil engineering at the University of Wisconsin for 28 years. Civil engineers are involved with the planning, design, and operation of public works facilities. Dr. Berg's particular specialty is transportation. His master's thesis addressed safety at railroad highway grade crossings, and he has published over 60 papers of which a large percent dealt with railroad issues, including causal factors associated with train collisions.

¶ 24 Dr. Berg testified that for 15 to 20 years he served on a committee of the Transportation Research Board of the National Academy of Sciences studying rail highway grade crossing safety. The focus of the committee was to minimize collisions between trains and motor vehicles or trains and pedestrians. To do so, the committee examined the nature of the usage of crossings, as well as people's knowledge, attitudes, and behavior patterns. The committee examined the effectiveness of warning devices and engineering improvements, with the objective of learning more about these systems so as to attain higher levels of safety. Dr. Berg has been retained by numerous railroads over the years on matters like the one at bar.

¶ 25 Dr. Berg testified that plaintiff was injured on tracks running between Central Avenue and Ridgeland Avenue. The tracks at this location are almost 6,000 feet in length (a little over one mile) and contain no crossing for vehicles or pedestrians. Dr. Berg noted there are schools and homes on each side of the tracks and he opined that people are going to want to cross the tracks on foot or by bicycle to visit their friends and go to school, as well as to visit two nearby parks containing baseball diamonds and tennis courts. Dr. Berg reviewed discovery in the case that supported his opinion, noting that at the location of plaintiff's injuries, railroad police had issued an average of 15 tickets per year for a six-year period to

persons crossing the tracks outside of a public crossing. Dr. Berg also reviewed deposition testimony from young people in the area who testified they were crossing the tracks on a somewhat regular basis. Further, part of a fence had been rolled back so as to allow pedestrians to approach and cross the tracks.

¶ 26    Dr. Berg opined that "[t]here's absolutely no question that young people are regularly crossing the tracks along this 6,000-foot corridor" to visit friends, schools, and parks on the other side. Since there is no designated place to cross the tracks other than the two main arterials that are 6,000 feet apart, Dr. Berg noted that people are going to cross at the intermediate points. Dr. Berg further testified that "young people and trains don't mix" and that from an engineering standpoint, one wants to provide some separation between the areas where people congregate and the area where the trains are located.

¶ 27    Dr. Berg opined that the corridor between Central Avenue on the east and Ridgeland Avenue on the west, which included the area where plaintiff was injured, was not reasonably safe for children because there were no established crossing points for a very long distance. That "puts them in conflict with trains." Even though IHB conducted Operation Lifesaver educational programs and issued tickets to trespassers, further engineering efforts were needed to accommodate the demand of pedestrians to cross the tracks.

¶ 28    Dr. Berg opined that a public facility was needed to accommodate pedestrians and bicyclists. Such a facility would consist of either an at-grade crossing with appropriate warning devices, or a grade separation such as "a ramp that goes up high enough and then an overpass over the tracks and a ramp coming back down." To encourage pedestrians to use this established crossing point, they would be "channelize[d]" with appropriate fencing that would discourage them from crossing at other points. Dr. Berg testified that an overpass would be more effective than an at-grade crossing because pedestrians can traverse an overpass regardless of whether or not a train is present.

¶ 29    Dr. Berg testified he would construct the overpass at Austin Avenue, because that location is midway between Central Avenue and Ridgeland Avenue. An overpass at Austin Avenue would provide relatively convenient access for people who want to go from the neighborhood north of the tracks to the schools to the south. Dr. Berg testified that once the overpass at Austin Avenue is constructed, the railroads should monitor the extent to which pedestrians continue to climb over and under the fence and cross the tracks near the site of where plaintiff was injured. If pedestrian traffic at that site remains high, then another overpass there should be considered.

¶ 30    Dr. Berg testified he was not suggesting that defendants should put up a fence around all of the "miles and miles of right-of-way." Rather, the fencing should be put up along the 6,000-foot corridor between Central Avenue and Ridgeland Avenue because the pedestrians in that area demonstrated a clear demand to travel from one side of the tracks to the other in order to access schools, houses, and parks. Such fencing would channel the pedestrians to the centrally located Austin Avenue crossing point, thereby serving to promote and advance safety in this corridor.

¶ 31    Dr. Berg opined that more likely than not, plaintiff would not have been injured had there been fencing which channeled pedestrians to a centrally located Austin Avenue crossing

point. The reason is that plaintiff and his friends originally had intended to cross the tracks to go to Steve's house, but were prevented from doing so by the freight train. As there was no impediment to going close to the train, plaintiff approached the tracks and then made the ill-fated decision to jump aboard. Had there been fencing which channeled pedestrians to a crossing point at Austin Avenue, plaintiff and his friends likely would have crossed the tracks at Austin Avenue instead of waiting for the train to pass and deciding on the spur-of-the-moment to jump aboard.

¶ 32 Dr. Berg testified that as part of his work as an engineer, he had become familiar with the costs of constructing the proposed fencing and overpass. Dr. Berg testified that the cost of constructing a six-foot chain-link fence along both sides of the corridor between Central Avenue and Ridgeland Avenue in the areas that do not have any fencing would be approximately $27,000. The cost of constructing an eight-foot chain-link fence would be approximately $37,500. An overpass at Austin Avenue would cost no more than $150,000, unless there also was a full gate installation at a highway crossing requiring track circuitry and electronics, which could cost approximately $250,000. However, Dr. Berg testified that such a full gate installation would not be necessary for an overpass at Austin Avenue.

¶ 33 Dr. Berg testified that an overpass at Austin Avenue would have to comply with the Americans with Disabilities Act (ADA) and other federal laws regarding making the overpass handicapped accessible and that the concurrence of the Illinois Commerce Commission (ICC) would need to be secured. Dr. Berg testified that compliance with the ADA, other federal laws, and the ICC would not significantly run up the costs because the designers of the overpass would be aware of and take into account the federal requirements and would know how to secure the requisite approvals from the ICC. Dr. Berg also testified that construction of an overpass at Austin Avenue would not impact waterways or wildlife environment in such a way as to add any significant costs to the project. Finally, Dr. Berg testified that to the extent an overpass at Austin Avenue would impact private property owners, the engineers for the project would talk to and work with the property owners to overcome any problems. Dr. Berg testified that in a similar situation in Madison, Wisconsin, he had been personally involved in routing a new bike path along a railroad right-of-way onto private property. The property owners there cooperated and did not pose any problems. Dr. Berg testified that, similar to the routing of the bike path in Madison, any problems associated with the overpass's impact on private property owners here would also not be insurmountable.

¶ 34 Defendants' expert, Carl Bradley, testified he was self-employed as a consultant with respect to railroad-related injuries and accidents. Mr. Bradley previously had been employed as a brakeman for a railroad from 1960 until 1966, as a conductor from 1966 to 1976, and eventually was promoted to terminal superintendent in 1979. Mr. Bradley later moved on to railroad management positions in Colorado, Texas, and California and then retired in 2000 and became a consultant.

¶ 35 Mr. Bradley testified he disagreed with Dr. Berg's opinion that chain-link fencing which channeled pedestrians to an overpass at Austin Avenue likely would have prevented plaintiff from being injured. Mr. Bradley noted the unlikelihood that the chain-link fence would remain intact throughout the 6,000-foot corridor between Central Avenue and Ridgeland

Avene, as kids were likely to cut holes in the fence. Mr. Bradley opined that a big concrete or steel wall erected along the corridor would likely keep trespassers off the right-of-way, but he doubted the property owners would agree to the construction of such a wall considering that it would be so unsightly.

¶ 36 Mr. Bradley testified that Dr. Berg had underestimated the costs of constructing an overpass at Austin Avenue, and that he failed to sufficiently address whether the overpass would be ADA-compliant or whether local villages would support such a structure.

¶ 37 Mr. Bradley testified that before he retired in 2000, the city of Roseville, California, proposed building an ADA-accessible pedestrian overpass 25 feet above the railroad track. It had a roof on top and cost $7.5 million. On cross-examination, Mr. Bradley admitted that he had seen overpasses cost much less than $7.5 million.

¶ 38 Following all the evidence, the jury returned a verdict in favor of plaintiff in the amount of $6.5 million, which it reduced to $3.9 million after finding that plaintiff was 40% comparatively negligent. Defendants appeal. The American Tort Reform Association, the Association of American Railroads, and the Illinois Civil Justice League, Washington Legal Foundation, and Allied Educational Foundation filed *amici curiae* briefs in support of defendants. The Illinois Trial Lawyers Association filed an *amicus curiae* brief in support of plaintiff. The *amici curiae* briefs largely mirror the arguments of the parties they support.

¶ 39 First, defendants contend the circuit court erred in denying their motion for judgment notwithstanding the verdict because plaintiff's act of jumping aboard a moving freight train presented an open and obvious danger for which defendants owed the minor plaintiff no duty of care. Judgments notwithstanding the verdict should be entered only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). The circuit court's decision denying defendants' motion for judgment notwithstanding the verdict is reviewed *de novo*. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006).

¶ 40 Plaintiff bears the burden of proving that defendants owed him a duty of care. *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 116 (1995). Prior to the supreme court's decision in *Kahn v. James Burton Co.*, 5 Ill. 2d 614 (1955), the "attractive nuisance" doctrine governed the duty of owners and occupiers of land (hereinafter referred to collectively as landowners) to a trespassing child who was injured on their premises. *Cope v. Doe*, 102 Ill. 2d 278, 285 (1984). Under the attractive nuisance doctrine, the defendant landowner was liable for injuries to the child caused by a condition that attracted him to the premises. *Cope*, 102 Ill. 2d at 285. The courts employed the fiction that the child was an invitee because defendant enticed the child to enter the premises by maintaining a condition that was attractive. *Cope*, 102 Ill. 2d at 285. Defendant owed a duty to take reasonable precautions protecting the child from injuries. *Cope*, 102 Ill. 2d at 285.

¶ 41 In *Kahn*, the supreme court rejected the attractive nuisance doctrine and held that the liability of landowners upon whose land a child is injured is determined with reference to the customary rules of ordinary negligence. *Kahn*, 5 Ill. 2d at 624. Generally, landowners owe no duty to keep their premises in any particular condition promoting the safety of persons

-10-

who come on the premises without invitation. *Corcoran v. Village of Libertyville*, 73 Ill. 2d 316, 325 (1978). However, in *Kahn*, the supreme court recognized:

"[A]n exception exists where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. [Citation.] The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child." *Kahn*, 5 Ill. 2d at 625.

¶ 42 In *Corcoran*, 73 Ill. 2d at 326, the supreme court noted that *Kahn* brought Illinois law into harmony with section 339 of the Restatement (Second) of Torts, which states:

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children." Restatement (Second) of Torts § 339 (1965).

¶ 43 Thus, a duty is imposed on the landowner only if he "knows or should know that children frequent the premises *and* if the cause of the child's injury was a *dangerous* condition on the premises." (Emphasis in original.) *Corcoran*, 73 Ill. 2d at 326. A dangerous condition is "one which is likely to cause injury to the general class of children who, by reason of their immaturity, might be incapable of appreciating the risk involved." *Corcoran*, 73 Ill. 2d at 326. If both these prerequisites are met, the harm to children is deemed sufficiently foreseeable for the law to impel the landowner to remedy the condition. *Corcoran*, 73 Ill. 2d at 326.

¶ 44 However, the supreme court has held that *Kahn* imposes no duty on landowners to protect against conditions that pose obvious risks of danger that children would be expected to appreciate and avoid. *Corcoran*, 73 Ill. 2d at 326; *Mt. Zion*, 169 Ill. 2d at 117. "The rationale for this rule is that, since children are expected to avoid dangers which are obvious,

there is no reasonably foreseeable risk of harm. The law then is that foreseeability of harm to the child is the test for assessing liability; but there can be no recovery for injuries caused by a danger found to be obvious." *Cope*, 102 Ill. 2d at 286. "The exception for obvious dangers is 'not merely a matter of contributory negligence or assumption of risk, but of lack of duty to the child.' " *Mt. Zion*, 169 Ill. 2d at 117-18 (quoting Prosser and Keeton on Torts § 59, at 409 (W. Page Keeton *et al.* eds. 5th ed. 1984)).

¶ 45    There is both an objective *and* subjective test for determining whether a danger is obvious to a trespassing child. Under the objective test, a danger is considered obvious to a trespassing child if "children of similar age and experience would be able to appreciate the dangers on the premises." *Salinas v. Chicago Park District*, 189 Ill. App. 3d 55, 61 (1989). Under this test, any subjective inability of the trespassing child to appreciate the danger is not considered when a risk is deemed obvious to children generally. *Salinas*, 189 Ill. App. 3d at 61.

¶ 46    Under the subjective test, a danger is considered obvious to a trespassing child if he has "some *greater* understanding of the alleged dangerous condition than would a typical minor of his age" that allows him to subjectively appreciate the full risk of harm. (Emphasis added.) *Swearingen v. Korfist*, 181 Ill. App. 3d 357, 362 (1989); see also *Colls v. City of Chicago*, 212 Ill. App. 3d 904, 946 (1991); *Hagy v. McHenry County Conservation District*, 190 Ill. App. 3d 833, 840 (1989). The rationale comes from the following comments to section 339 of the Restatement (Second) of Torts, which the *Swearingen* court found "persuasive" (*Swearingen*, 181 Ill. App. 3d at 362):

> "The purpose of the duty is to protect children from dangers which they do not appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known and appreciated danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the *full risk* involved, but none the less chooses to encounter it out of recklessness or bravado." (Emphasis added.) Restatement (Second) of Torts § 339, cmt. m, at 204 (1965).

¶ 47    I. Whether Plaintiff's Act of Jumping Aboard the Moving Freight Train
Posed an Obvious Danger Under the Objective Test

¶ 48    First, defendants contend they are entitled to judgment notwithstanding the verdict because plaintiff's act of jumping aboard the moving freight train traveling 9 to 10 miles per hour posed an obvious danger that children of plaintiff's age and experience can be expected to appreciate as a matter of law. In support, defendants cite *LeBeau v. Pittsburg, C., C. & St. L. Ry. Co.*, 69 Ill. App. 557 (1897), *Fitzgerald v. Chicago, Burlington & Quincy R.R. Co.*, 114 Ill. App. 118 (1904), and *Briney v. Illinois Central R.R. Co.*, 401 Ill. 181 (1948). In *LeBeau*, Leo LeBeau, who was 10 years and 5 months old, attempted to jump on a moving freight train of unidentified speed and fell under the wheel of one of the cars. *LeBeau*, 69 Ill. App. at 558. As a result, his right leg was required to be amputated. *LeBeau*, 69 Ill. App. at

-12-

558. LeBeau, by his next friend, brought suit against the defendant railroad, alleging it was negligent in failing to warn him to keep away from the railroad crossing. *LeBeau*, 69 Ill. App. at 559. The court instructed the jury to return a verdict in favor of the railroad. *LeBeau*, 69 Ill. App. at 558. The appellate court affirmed, holding as a matter of law that "[j]umping from the ground upon a moving freight train is dangerous, all men and all ordinarily intelligent boys ten years of age know it to be so." *LeBeau*, 69 Ill. App. at 560. In *Fitzgerald*, 12-year-old William Fitzgerald attempted to climb aboard a "slowly" moving freight train and fell in front of the wheels, causing his legs to be crushed so badly that they were required to be amputated. *Fitzgerald*, 114 Ill. App. at 119-20. Fitzgerald, by his next friend, brought suit against the defendant railroad. *Fitzgerald*, 114 Ill. App. at 120. At the close of Fitzgerald's case, the circuit court instructed the jury to find the railroad not guilty. *Fitzgerald*, 114 Ill. App. at 120. The appellate court affirmed, noting that "[i]n [*LeBeau*], under similar circumstances we held that a boy ten years and five months of age, of ordinary intelligence, as we must presume from the evidence the plaintiff was, knows that it is dangerous to attempt to get on a moving freight train. Such is the law in this state, and we cannot depart from it." *Fitzgerald*, 114 Ill. App. at 120-21. However, neither of these decisions is binding as they were decided prior to 1935 (*LeBeau* was 1897 and *Fitzgerald* was 1904). See *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996) ("[a]ppellate court decisions issued prior to 1935 had no binding authority").

¶ 49    In *Briney*, Daniel C. Briney, who was eight years and nine months old, attempted to jump aboard a freight train moving at approximately four miles per hour but he slipped and fell in such a manner that his left leg was run over, requiring amputation. *Briney*, 401 Ill. at 184. Briney, by his next friend, brought suit on the theory that the defendant railroad impliedly invited him to come on its right-of-way and throw switches for its employees in exchange for gifts. *Briney*, 401 Ill. at 185. A jury returned a verdict in Briney's favor for $35,000. *Briney*, 401 Ill. at 182. The supreme court reversed, holding that Briney's effort to jump aboard the train had no connection with the alleged invitation and that he was a trespasser at the time of the injury. *Briney*, 401 Ill. at 187-88. The supreme court held that since Briney was a trespasser, the defendant railroad only owed him the duty not to wilfully and wantonly injure him. *Briney*, 401 Ill. at 186. No such duty was breached. *Briney*, 401 Ill. at 188-91.

¶ 50    *Briney* is not applicable here, as it was decided seven years before *Kahn* and as the court did not consider whether the defendant railroad owed the minor plaintiff a duty of care if his act of attempting to jump aboard the moving train was foreseeable, nor did it address whether the danger of such an act was so open and obvious as to negate any duty owed by the railroad.

¶ 51    We find two more recent cases, *La Salle National Bank v. City of Chicago*, 132 Ill. App. 3d 607 (1985), and *Engel v. Chicago & North Western Transportation Co.*, 186 Ill. App. 3d 522 (1989), both decided subsequent to *Kahn*, to be dispositive. In *La Salle*, nine-year-old Charles Murphy was severely injured when he fell while climbing aboard a moving freight train of unidentified speed owned and operated by Consolidated Rail Corporation (Conrail), after gaining access to the railroad tracks by climbing through a hole in a fence constructed and maintained by the city of Chicago (the city). *La Salle*, 132 Ill. App. 3d at 609. The fence, which was erected pursuant to a contract between the city and Conrail's predecessor,

separated the city's land from that of the railroad. *La Salle*, 132 Ill. App. 3d at 611, 613. The city allowed the fence to remain in a state of disrepair despite its knowledge that children were using the hole in the fence to gain access to the railroad tracks. *La Salle*, 132 Ill. App. 3d at 613.

¶ 52 Murphy brought suit against Conrail and the city alleging negligence and wilful and wanton conduct. *La Salle*, 132 Ill. App. 3d at 609. The jury found in favor of Conrail and the city as to wilful and wanton conduct, but found in favor of Murphy as to negligence and awarded him damages of $1,130,000. *La Salle*, 132 Ill. App. 3d at 609. The jury determined Murphy had been 18% negligent and reduced his damage award to $926,600. *La Salle*, 132 Ill. App. 3d at 609.

¶ 53 On appeal, the city argued in pertinent part that the jury's finding that Murphy was 18% comparatively negligent constituted a conclusive determination that he appreciated the danger of climbing aboard the moving train and therefore he should be precluded from recovering any damages. *La Salle*, 132 Ill. App. 3d at 615. The appellate court affirmed the jury award, holding that, under *Kahn*, the city owed Murphy a duty of ordinary care and that it was a jury question as to whether the city had breached that duty resulting in injury to Murphy. *La Salle*, 132 Ill. App. 3d at 615. The appellate court further held that the jury's finding of 18% comparative negligence on the part of Murphy did not constitute a finding that he appreciated the risk involved in attempting to climb aboard a moving freight train. *La Salle*, 132 Ill. App. 3d at 615.

¶ 54 In *Engel*, 12-year-old John Engel filed suit against the Chicago Park District to recover damages for injuries he sustained when he jumped from a moving freight train traveling four or five miles per hour. *Engel*, 186 Ill. App. 3d at 524-25. Prior to the accident, Engel had met some friends at Hermosa Park, which was operated by the Chicago Park District. *Engel*, 186 Ill. App. 3d at 525. The entire park was fenced, but for at least two years prior to Engel's injury, the west side of the fence had a large hole extending from the top of the fence to the bottom which children and adults used as a short cut to gain access to railroad tracks bordering the west side of the park. *Engel*, 186 Ill. App. 3d at 525. The Chicago Park District failed to repair the hole in the fence, despite its knowledge of the hole's existence and its awareness that children used the hole to gain access to the railroad tracks and to jump aboard and take short rides on the trains (a practice known as "flipping" the trains). *Engel*, 186 Ill. App. 3d at 525.

¶ 55 On the day he was injured, Engel and his friends decided to go to a nearby store for candy. *Engel*, 186 Ill. App. 3d at 527. The shortest route to the store was through the hole in the fence and over the railroad tracks. *Engel*, 186 Ill. App. 3d at 527. Engel noticed a train traveling four or five miles per hour. *Engel*, 186 Ill. App. 3d at 527. Engel got on a ladder on the side of the train and rode for approximately 30 feet before jumping off to join his friends. *Engel*, 186 Ill. App. 3d at 527. Engel spun around and fell and his left leg went under the train. *Engel*, 186 Ill. App. 3d at 527. Engel's leg was amputated in the hospital. *Engel*, 186 Ill. App. 3d at 527.

¶ 56 The jury returned a verdict in Engel's favor for $5 million in compensatory damages. *Engel*, 186 Ill. App. 3d at 527. On appeal, the Chicago Park District argued it owed no duty

to Engel as a matter of law to protect him from the obvious danger of climbing aboard a moving train and, therefore, the case never should have gone to the jury. *Engel*, 186 Ill. App. 3d at 528. Engel responded that although the supreme court has held that fire, drowning in water, and falling from a height are obvious dangers children reasonably may be expected to fully understand and appreciate (see *Corcoran*, 73 Ill. 2d at 327 (citing Restatement (Second) of Torts § 339, cmt. j, at 203 (1965))), the danger of jumping aboard a slow-moving train should not be presumed to be fully understood and appreciated by all children as a matter of law but, rather, should be individually assessed as questions of fact. *Engel*, 186 Ill. App. 3d at 528.

¶ 57 The appellate court agreed with Engel and affirmed the jury award. Citing *La Salle* as persuasive authority, the court held:

> "The main reason the case cannot be determined as a matter of law is that the 'obviousness' of the danger is not such that no minds could reasonably differ. The policy determination that most children are presumed to know the risks of injury inherent in certain types of activities, such as playing with fire or playing in bodies of water does not *per se* extend to the train-flipping cases. Under different facts than are present in this case, however, a judge could find that the danger was obvious to a plaintiff or that the landowner was unaware of the condition and find no duty existed as a matter of law." *Engel*, 186 Ill. App. 3d at 530-31.

¶ 58 Defendants here argue that the present case presents those "different facts" supporting a finding as a matter of law that the danger from plaintiff's jumping aboard the moving freight train was so objectively obvious as to preclude a duty on the part of defendants. Specifically, defendants point out that the train here was moving twice the speed of the train in *Engel*. Also, whereas Engel had seen people jump onto moving trains seven or eight times without incident (*Engel*, 186 Ill. App. 3d at 526), plaintiff here admitted he had never seen anyone successfully jump on a train and had in fact seen his friend Charlie Spindler try unsuccessfully to jump aboard the train only moments before his attempt. Also, plaintiff himself testified to his own two unsuccessful attempts to jump on the train prior to the third attempt leading to his injuries. Defendants contend that on these facts, they owed no duty as a matter of law because children of similar age and experience would appreciate the danger of attempting to jump aboard the moving freight train and, as such, that the circuit court should have granted their motion for judgment notwithstanding the verdict.

¶ 59 We disagree. Although the train was running twice as fast as the train in *Engel*, it still was traveling only 9 to 10 miles per hour. Plaintiff testified he was able to keep up with the train while running beside it, and that if he had wanted to, he could have run past the ladder hanging alongside. Plaintiff also testified that despite his small size, he was able to reach up and grab the ladder while standing flat-footed, which indicates he was not required to take a large leap in order to gain access thereto. Prior to plaintiff's jump, Charlie put his hand out toward the train and then pulled it back in and (according to Mr. Patton) he fell down, but there was no testimony that Charlie was hurt in any way thereby. After Charlie stepped away, plaintiff then made two unsuccessful attempts to jump on the train prior to his injuries. On the first attempt his fingers struck the ladder and were bent back, but plaintiff testified "there wasn't no pain or nothing." On his second attempt, plaintiff ran alongside the train and

grabbed onto the ladder, but he was forced to let go when his shoes began slipping on the rocks. There was no evidence that plaintiff was hurt thereby. Plaintiff was injured on his third attempt to jump aboard the freight train. The "obviousness" of the danger of jumping aboard a slow-moving, 9 to 10 mile per hour freight train that the not-yet 13-year-old plaintiff could outrun and which had caused neither him nor his friend harm in their previous attempts to board, and the ladder of which was within reach of the plaintiff while standing flat-footed, is not such that no minds could reasonably differ. Accordingly, we reject defendants' argument that they are entitled to judgment notwithstanding the verdict because plaintiff's act of jumping aboard said freight train was an obvious danger that children of plaintiff's general age and experience can be expected to appreciate as a matter of law. The issue was one of fact for the jury to determine; viewed in the light most favorable to plaintiff, the evidence does not so overwhelmingly favor defendants that no contrary verdict could stand. Defendants' argument for judgment notwithstanding the verdict is unavailing.

¶ 60     Defendants cite cases in other jurisdictions holding as a matter of law that young children should objectively recognize the danger of attempting to jump aboard a moving train. See, *e.g.*, *Holland v. Baltimore & Ohio R.R. Co.*, 431 A.2d 597 (D.C. 1981) (and the cases cited therein); Restatement (Second) of Torts § 339, Appendix, Reporter's Note, at 133-34 (1966) (and the cases cited therein). As there is Illinois authority on the point of law in question, we need not look to other states for guidance. *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 744 (2000).

¶ 61     Defendants cite a leading treatise, Prosser and Keeton on Torts § 59, at 407 (W. Page Keeton *et al.* eds. 5th ed. 1984), which observes that certain courts in other states have held that the peril of moving vehicles is a danger that children can be expected to understand as a matter of law. As discussed above, we need not look to out-of-state cases when there is Illinois authority on the point in question. Further, we note that another leading treatise, 1 Dan D. Dobbs, The Law of Torts § 236, at 613 (2001), states:

> "The highest tradition of the common law requires justice according to the facts of the case, not according to a model of cases in general, and it is not beyond conception that some children would foreseeably be unable to appreciate the risk of moving trains, just as they are unable to appreciate the risk of other moving machinery."

¶ 62     On the facts of the present case, it is not beyond conception that children of plaintiff's general age and experience would foreseeably be unable to appreciate the risk of jumping aboard the moving freight train traveling 9 to 10 miles per hour. As discussed above, the issue was one of fact for the jury to determine; viewed in the light most favorable to plaintiff, the evidence does not so overwhelmingly favor defendants that no contrary verdict could stand. Accordingly, defendants' argument for judgment notwithstanding the verdict fails.

¶ 63     II. Whether Plaintiff's Act of Jumping Aboard the Moving Freight
Train Posed an Obvious Danger Under the Subjective Test

¶ 64     Next, defendants contend they are entitled to judgment notwithstanding the verdict because plaintiff subjectively appreciated the danger and full risk of harm from jumping aboard the moving freight train and therefore defendants owed him no duty of care. In

-16-

support, defendants point to the following evidence: plaintiff's mother had repeatedly warned him of the dangers of moving trains and had even told him that he could lose his limbs in a train accident; plaintiff had been caught trespassing on railroad property prior to July 30, 2003, and had been warned to stay away by railroad police officers; the train that injured him was large and loud, further indicating to plaintiff its dangerousness and full risk of harm; Mr. Patton and several of plaintiff's friends at the scene knew the danger of jumping aboard a moving train and warned him against approaching the train; and plaintiff's first two attempts to jump on the train ended in failure. Defendants contend all this evidence indicates that plaintiff subjectively appreciated the danger and full risk of harm from jumping aboard the moving freight train, but that he recklessly disregarded the risk to impress Alisa. Defendants cite Restatement (Second) of Torts § 339, cmt. m, at 204 (1965), which states "the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved, but none the less chooses to encounter it out of recklessness or bravado." Defendants contend they owed plaintiff no duty as a matter of law due to his subjective appreciation of the danger and full risk of harm from jumping aboard the moving freight train and, therefore, the circuit court should have granted their motion for judgment notwithstanding the verdict.

¶ 65    However, there was contrary evidence indicating plaintiff did not subjectively appreciate the danger and full risk of harm. Specifically, plaintiff testified at trial that, at the time he was attempting to board the moving train, he did not know he was doing something dangerous, which he defined as "something that could kill you or take a body part"; he testified he only knew it was dangerous after the injuries occurred. Defendants contend that plaintiff was impeached with his deposition testimony in which he responded yes when asked whether he currently recognizes that "on the day of the accident" the train tracks were dangerous and that the train was dangerous. Plaintiff's deposition testimony indicates only that plaintiff was aware at the time of the deposition (*after* he had suffered his injuries) that the train and the tracks were dangerous. The deposition testimony is unclear as to when plaintiff *first* recognized that the train and the tracks were dangerous, *i.e.*, whether he recognized the danger before he was injured or whether he recognized the danger only after he was injured; thus, the deposition testimony does not clearly contradict his trial testimony that he was unaware of the danger and full risk of harm at the time of his injuries.

¶ 66    In addition, there was other evidence indicating that plaintiff did not subjectively appreciate the danger and full risk of harm at the time he was injured. Specifically, plaintiff testified, contrary to his mother's testimony, that she never told him he could be killed or lose an arm or a leg as a result of a train accident. Plaintiff denied receiving any graphic warnings from his mother regarding how badly he might be hurt in a train accident. Plaintiff also testified he never heard the warnings from Mr. Patton or his own friends to stay away from the train. Finally, although plaintiff's two previous attempts to jump aboard the train had been unsuccessful, he was not injured on either of these attempts. Plaintiff testified to his belief at the time he was injured that he would be able to jump on and off the train with no problems.

¶ 67    As there was conflicting evidence regarding whether plaintiff subjectively appreciated the danger and full risk of harm at the time he was injured, we cannot say that the evidence,

when viewed in the light most favorable to plaintiff, so overwhelmingly favors defendants that no contrary verdict could ever stand. Accordingly, the circuit court did not err in denying defendants' motion for judgment notwithstanding the verdict.

¶ 68    III. Whether Plaintiff Showed the Expense of Remedying the Dangerous Condition
Was Slight as Compared to the Risk to Children

¶ 69    Next, defendants contend the circuit court erred in denying their motion for judgment notwithstanding the verdict because plaintiff failed to prove that the expense or inconvenience of remedying the dangerous condition was slight compared to the risk to children. See *Kahn*, 5 Ill. 2d at 625. In particular, defendants contend that the testimony of plaintiff's expert, Dr. Berg, was insufficient to establish this element of the *Kahn* test for three reasons: (1) Dr. Berg's proposed improvements would not have prevented plaintiff from jumping aboard the train; (2) Dr. Berg's proposed improvements are prohibitively costly, as they would require defendants to fence their entire right-of-way; and (3) Dr. Berg's proposed improvements could not feasibly be implemented. We address each argument in turn.

¶ 70    A. Would Dr. Berg's Proposed Improvements Have Prevented Plaintiff
From Jumping Aboard the Moving Freight Train?

¶ 71    Dr. Berg testified to the dangerous condition resulting from approximately 6,000 feet of tracks between Central Avenue and Ridgeland Avenue that contained no crossing for vehicles or pedestrians. Dr. Berg noted that young persons regularly were crossing along the 6,000-foot corridor to access schools, homes, and parks. Dr. Berg opined that to prevent injury-causing collisions from occurring, engineering efforts were needed to accommodate the pedestrian demand to cross the tracks. Specifically, Dr. Berg opined that either an at-grade crossing or an overpass should be constructed at Austin Avenue, which was the mid-way point between the 6,000 feet of tracks, to provide convenient access for persons wanting to cross the tracks. Dr. Berg preferred an overpass because pedestrians would be able to cross the train tracks even if a train was passing by. Dr. Berg opined that fencing should be put up along the 6,000-foot corridor to "channelize" pedestrians toward the new crossing point at Austin Avenue and discourage them from crossing at other points.

¶ 72    Defendants argue that Dr. Berg's proposed engineering improvements at most would have reduced the risk that persons would cross the tracks at an unauthorized location between Central Avenue and Ridgeland Avenue. Defendants argue that the engineering improvements "would have done nothing to abate the condition that injured [plaintiff], which was the ever-present risk that trespassing children would try *to jump onto a moving train* wherever they could gain access to the tracks." (Emphasis in original.) Accordingly, defendants contend the circuit court should have granted them judgment notwithstanding the verdict.

¶ 73    We disagree. Dr. Berg noted that plaintiff's original intent was to cross over the tracks to reach his friend's, Steve's, house on the other side, but that he was prevented from doing so by the passing freight train. While waiting for the freight train to pass, plaintiff

-18-

approached the tracks and made the spur-of-the-moment decision to jump aboard the train to impress Alisa. Dr. Berg testified that, more likely than not, plaintiff would not have been injured had there been fencing which channeled pedestrians to a centrally located crossing point at Austin Avenue, which would have allowed plaintiff to cross over the tracks instead of waiting around and then deciding to jump aboard the moving freight train. Defendants' expert, Mr. Bradley, disagreed with Dr. Berg's opinion that chain-link fencing which channeled pedestrians to an overpass at Austin Avenue would have prevented plaintiff from being injured. However, it was the province of the jury to listen to the competing experts and weigh all the evidence (*Bosco v. Janowitz*, 388 Ill. App. 3d 450, 462 (2009)), and it obviously gave greater weight to Dr. Berg's testimony. Viewed in the light most favorable to plaintiff (*Pedrick*, 37 Ill. 2d at 510), Dr. Berg's testimony was sufficient for the jury to find that had there been fencing which channeled plaintiff to the Austin Avenue crossing point, he likely would have crossed there and gone to Steve's house instead of deciding to jump aboard the moving freight train. Thus, defendants' argument for judgment notwithstanding the verdict fails, as the evidence regarding whether Dr. Berg's proposed improvements would have prevented plaintiff from jumping aboard the moving freight train did not so overwhelmingly favor defendants that no contrary verdict could ever stand.

¶ 74    B. Would Dr. Berg's Proposed Improvements Require Defendants
to Fence Their Entire Right-of-Way?

¶ 75    Defendants next argue that to prevent children from jumping on trains, fencing would have to be constructed over the *entire* right-of-way, not merely the corridor between Central Avenue and Ridgeland Avenue, and that multiple overpasses "dotting the landscape" also would have to be constructed. Defendants contend such protective measures against train-hopping children would be wholly impracticable and costly and therefore that the circuit court here should have granted them judgment notwithstanding the verdict. Defendants cite *Illinois State Trust Co. v. Terminal R.R. Ass'n of St. Louis*, 440 F.2d 497 (7th Cir. 1971), in which seven-year-old David Land fell under the wheels of a railroad car while attempting to jump aboard a moving train of unidentified speed. *Illinois State Trust*, 440 F.2d at 498-99. Land brought a personal injury action against Terminal Railroad Association of St. Louis (Terminal). The circuit court entered a directed verdict in favor of Terminal. *Illinois State Trust*, 440 F.2d at 498. On Land's appeal, the Seventh Circuit Court of Appeals affirmed, holding in pertinent part: "[t]he only methods of insuring that such injuries would not recur would be to fence the right-of-way at crossings where there is any likelihood of children's presence or to construct an overpass or underpass or place a guard at all such crossings. We do not believe Illinois law imposes any such requirement." *Illinois State Trust*, 440 F.2d at 501.

¶ 76    In the present case, Dr. Berg never testified that defendants should be required to fence all their rights-of-way and to construct overpasses or underpasses at all crossings. Instead, Dr. Berg testified defendants would not have to put up a fence over all of the "miles and miles of right-of-way" but, rather, only along the 6,000-foot corridor between Central Avenue and Ridgeland Avenue in the areas that do not have any fencing. Dr. Berg reasoned

-19-

that the 6,000-foot corridor posed a unique danger to children because it constituted over a mile of tracks without any type of crossing point, and that the demand for such a crossing was high given that travel across the tracks along that corridor was necessary to access schools, houses, and parks on the other side. Accordingly, Dr. Berg opined that an overpass at the midway point of the 6,000-foot corridor at Austin Avenue, coupled with fencing along the corridor channeling pedestrians to that crossing, would be sufficient to remedy the danger. Viewed in the light most favorable to plaintiff, Dr. Berg's testimony was sufficient for the jury to find that the fencing and overpass would be limited to the 6,000-foot corridor and would not have to be replicated elsewhere along the right-of-way. Thus, defendants' argument for judgment notwithstanding the verdict fails, as the evidence regarding whether Dr. Berg's proposed improvements would require defendants to fence their entire right-of-way did not so overwhelmingly favor defendants that no contrary verdict could ever stand.

¶ 77        C. Could Dr. Berg's Proposed Improvements Feasibly Be Implemented?

¶ 78        Defendants next argue that the circuit court should have granted them judgment notwithstanding the verdict because there was no factual support for a finding that Dr. Berg's proposed improvements along the 6,000-foot corridor feasibly could be implemented, much less that their expense or inconvenience would be slight. Specifically, defendants argue that Dr. Berg never had been involved in the design or construction of an overpass and had not provided a detailed design or cost estimate of the overpass he advocated; he had not settled on the basic design parameters of the overpass; he "brushed aside" planning issues such as compliance with the ADA and other accessibility requirements, the overpass's environmental impact, its impact on traffic flow, land use, and other property owners, and the need to coordinate its construction with Chicago Ridge and Oak Lawn; he dismissed the notion that defendants would have difficulty securing permission from the ICC to build the overpass; he ignored the costs of acquiring easements or title from neighboring property owners; he failed to take into account the costs of maintaining the chain-link fence; and he dramatically understated the costs for installing fencing.

¶ 79        Review of Dr. Berg's testimony indicates that he provided adequate factual support for his conclusions that the construction of fencing and an overpass at Austin Avenue feasibly could be implemented at a relatively low cost. Specifically, Dr. Berg testified to his work experience as a civil engineer specializing in transportation and his years of experience working to make railroad crossings safe. During his years of work as a civil engineer, Dr. Berg had become familiar with the costs of constructing the proposed fencing and overpass. Dr. Berg testified that the cost of constructing a six-foot chain-link fence along both sides of the 6,000-foot corridor in the areas that do not have any fencing would be approximately $27,000, and that the cost of constructing an eight-foot chain-link fence would be approximately $37,500. An overpass at Austin Avenue would cost a maximum of $150,000, unless there was also a full gate installation, in which case the cost would increase by $100,000; however, Dr. Berg testified that such a gate would not be required at Austin Avenue and so the cost would remain approximately $150,000. Contrary to defendants' arguments, Dr. Berg did not "brush aside" planning issues, but rather he testified to the need for the improvements to comply with the ADA and other federal laws as well as the need to

secure the concurrence of the ICC. Based on his experience, the costs of compliance with the ADA, other federal laws, and the ICC would not be significant. Also, contrary to defendants' arguments, Dr. Berg testified that the improvements would have negligible impact on the environment and that such an impact would not significantly increase the costs of the project. Dr. Berg further testified to the ability of engineers to work with property owners to overcome any problems, and gave as an example his personal experience routing a new bike path along a railroad right-of-way. Finally, Dr. Berg testified that he expected the maintenance of the fence to cost very little.

¶ 80 Defendants' expert, Mr. Bradley, testified contrary to Dr. Berg that fencing which channeled pedestrians to an overpass at Austin Avenue likely would not have prevented plaintiff from being injured. Mr. Bradley also testified that Dr. Berg had underestimated the costs of constructing an overpass and he noted that a pedestrian overpass in the city of Roseville, California, had cost $7.5 million. On cross-examination, though, Mr. Bradley admitted that he had seen overpasses cost much less than $7.5 million.

¶ 81 The jury found Dr. Berg to be more credible than Mr. Bradley. We will not substitute our judgment therefor. *Davis v. Kraff*, 405 Ill. App. 3d 20, 37 (2010). Viewed in the light most favorable to plaintiff, Dr. Berg's testimony enabled plaintiff to satisfy the *Kahn* test by providing a sufficient factual foundation for the jury to find that the proposed improvements along the 6,000-foot corridor between Central Avenue and Ridgeland Avenue feasibly could be implemented and that their expense or inconvenience would be slight as compared to the risk to children. Accordingly, as the evidence on this issue does not so overwhelmingly favor defendants such that no contrary verdict could ever stand, we affirm the denial of defendants' motion for judgment notwithstanding the verdict.

¶ 82 In their petition to reconsider, defendants argue that Dr. Berg made a mathematical error in estimating the cost of fencing. Dr. Berg testified that defendants should construct a 6- to 8-foot-high fence along both sides of the 6,000-foot corridor in the areas that do not have any fencing. Dr. Berg also testified that the cost for installing the new chain-link fencing would be $18 per foot for a six-foot fence and $24 to $26 per foot for an eight-foot fence. Dr. Berg testified that this worked out to $27,000 for a six-foot fence and $37,500 for an eight-foot fence that would cover both sides (12,000 feet) of the corridor.

¶ 83 When defendants questioned Dr. Berg during cross-examination about his mathematical computations, he further testified that only approximately 25% of the corridor (3,000 feet) would require fencing. We note that, when the figures of $18 per foot for a six-foot fence and $24 to $26 per foot for an eight-foot fence are multiplied by 3,000 feet, they come out to $54,000 for a six-foot fence and between $72,000 and $78,000 for an eight-foot fence. Nobody performed this math for the jury, though, and Dr. Berg never specifically testified to any figures other than $27,000 and $37,500 as the respective costs for installing a six-foot or eight-foot fence along both sides of the corridor in the areas that do not have any fencing. During closing arguments, plaintiff specifically cited Dr. Berg's testimony and stated that "he estimated *** that the cost of completing the fence for this corridor would cost somewhere between $27,000 and $37,000." Defendants made no objections thereto.

¶ 84 Even if evidence *had* been presented to the jury that $54,000 and $72,000 to $78,000 are

more accurate estimates of the respective costs for installing a six-foot or eight-foot fence along both sides of the 6,000-foot corridor in the areas that do not have any fencing, our holding here would remain unchanged because the jury could find that such costs remain relatively slight compared to the risks to children if such fencing is not installed. Accordingly, we deny the petition to reconsider and affirm the denial of defendants' motion for judgment notwithstanding the verdict.

¶ 85                          IV. Whether the Court Erred In Its Evidentiary Rulings

¶ 86     Next, defendants contend the circuit court erred in admitting a certain portion of plaintiff's deposition testimony for impeachment purposes only instead of as a judicial admission. Judicial admissions are " 'deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge.' " *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 475 (2010) (quoting *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998)). Judicial admissions bind the party making them and cannot be controverted. *Rath v. Carbondale Nursing & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 536, 538 (2007). Where admissions at a pretrial deposition are deliberate, detailed and unequivocal as to a factual matter within the party's personal knowledge, those admissions are conclusively binding on the party-deponent and he may not contradict them at trial. *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 212-13 (1989). Whether deposition testimony constitutes a judicial admission because it is unequivocal is a question of law subject to *de novo* review. *Elliott v. Industrial Comm'n*, 303 Ill. App. 3d 185, 187 (1999).

¶ 87     The pertinent portion of plaintiff's deposition testimony is as follows:

"Q. [Defense attorney:] So you recognize train tracks as being dangerous; correct?

A. [Plaintiff:] Yes.

Q. And you recognize that on the day of the accident the train tracks were dangerous; correct?

A. Yes.

Q. And that the train that you were grabbing onto was dangerous?

A. Yes."

¶ 88     Defendants contend this testimony constituted a judicial admission that, at the time he was injured, plaintiff subjectively appreciated the danger and full risk of harm in jumping aboard the moving freight train and, as such, that the circuit court erred in admitting said testimony for impeachment purposes only and allowing plaintiff to contradict his admission at trial.

¶ 89     Careful review of the questions asked, and the answers given, during the pertinent deposition testimony reveals that plaintiff made no admission as to his appreciation of the danger and full risk of harm at the time he was injured. As cited above, defendants asked plaintiff whether he "recognize[s]" that, on the day he was injured, the train tracks and train were dangerous; by posing the questions in the present tense, defendants were asking plaintiff about his current recognition (at the time of the deposition questioning) as to the

-22-

dangers of the train tracks and train. Plaintiff's affirmative answers thereto only indicated his recognition, at the time of the deposition questions, that the train tracks and train posed a danger to him on the day of his injuries. Defendants never asked plaintiff whether he recognized the danger prior to his deposition testimony. Defendants also never specifically asked plaintiff whether he recognized the danger at the time he was injured, or whether he only recognized the danger after he was injured. Plaintiff's testimony therefore does not constitute deliberate and unequivocal statements as to his subjective appreciation of the danger and full risk of harm in jumping aboard the moving freight train at the time he was injured. The circuit court did not err in admitting said testimony for impeachment purposes only, and not as a binding judicial admission.

¶ 90    As a result of our disposition of this issue, we need not address plaintiff's argument that he made no judicial admission because defendants' questions asked him to testify to conclusions regarding the "dangerousness" of the train tracks and train instead of to concrete facts within his knowledge.

¶ 91    Next, defendants contend the circuit court erred by failing to give the following special interrogatory proposed by defendants:

> "At the time and place of [plaintiff's] accident, did he appreciate that attempting to jump onto a moving freight train presented a risk of harm to him?"

¶ 92    Section 2–1108 of the Code of Civil Procedure sets forth the law governing special interrogatories:

> "Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2–1108 (West 2008).

¶ 93    The circuit court's denial of a request for a special interrogatory is reviewed *de novo*. *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 6 (2006).

¶ 94    The circuit court can refuse to submit a special interrogatory to the jury only where the interrogatory is in improper form. *Hooper*, 366 Ill. App. 3d at 6. A special interrogatory is in proper form where it relates to an ultimate issue of fact on which the rights of the parties depend and where an answer to the special interrogatory would be inconsistent with some general verdict that the jury might return. *Hooper*, 366 Ill. App. 3d at 6.

¶ 95    In the present case, the proposed special interrogatory was not in proper form because an affirmative answer thereto would not have been inconsistent with the general verdict in plaintiff's favor. The special interrogatory asked the jury whether plaintiff appreciated that attempting to jump aboard the moving freight train presented "a risk of harm to him" at the time and place of the "accident." However, as discussed earlier in this opinion, the relevant inquiry is whether plaintiff appreciated the "*full* risk" of harm involved in jumping aboard

the moving freight train. See Restatement (Second) of Torts § 339, cmt. m, at 204 (1965); *Swearingen*, 181 Ill. App. 3d at 362; *Colls*, 212 Ill. App. 3d at 933. Plaintiff's appreciation of the *full* risk of harm (*i.e.*, death or dismemberment) from jumping aboard the moving freight train would have negated defendants' duty toward him and therefore would have been inconsistent with the general jury verdict in his favor. However, plaintiff's appreciation of some lesser risk of harm (*e.g.*, falling and spraining his ankle) would not have similarly negated defendant's duty toward him and would not have been inconsistent with the jury verdict in his favor. As the proposed special interrogatory only asked the jury whether plaintiff appreciated "*a* risk of harm" and not the "*full* risk of harm" from jumping aboard the moving freight train, the special interrogatory was not in proper form and the circuit court committed no error in refusing to give it to the jury.

¶ 96    Defendants argue that plaintiff failed to object below to the improper wording of the proposed special interrogatory, and as such that he has waived this argument on appeal. We disagree. Plaintiff is the appellee here, not the appellant. An appellant waives an issue by failing to raise it in the circuit court. *Cooney v. Magnabosco*, 407 Ill. App. 3d 264, 268 (2011). However, "an appellee may raise any argument or basis supported by the record to show the correctness of the judgment below, even though he had not previously advanced such an argument." *In re Veronica C.*, 239 Ill. 2d 134, 151 (2010). Also, we can affirm the circuit court on any basis appearing in the record, regardless of the ground relied upon by the circuit court or whether its rationale was correct. *Cooney*, 407 Ill. App. 3d at 268. As discussed, the improper wording of the proposed special interrogatory prevented it from being in the proper form and supports the circuit court's decision not to give it to the jury, and we affirm on that basis.

¶ 97    Next, defendants take issue with various other evidentiary rulings made by the circuit court regarding the admissibility of evidence. Review is for an abuse of discretion. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995).

¶ 98    First, defendants contend the circuit court erred by barring them from questioning plaintiff's friends who were with him on July 30, 2003, as to whether they knew that jumping aboard a moving freight train was dangerous. Defendants contend such testimony was relevant and admissible to show that children of plaintiff's same general age and experience appreciated the danger of jumping on a moving freight train, as well as to show that plaintiff himself appreciated said danger. We find no abuse of discretion, as evidence of plaintiff's friends' knowledge of the dangers of jumping aboard the moving freight train was admitted at trial and argued to the jury. Specifically, the circuit court permitted plaintiff's friend Brittany to testify that "all" the girls in the parking lot on July 30, 2003, yelled at plaintiff to stop "playing around" the train and to "come back down." Brittany testified that she specifically yelled at plaintiff to "get off the f***ing tracks and don't go by the f***ing train." Brittany's testimony indicated her own awareness, as well as the awareness of the other children at the scene, as to the dangerousness of jumping aboard the moving freight train. During closing arguments, defense counsel told the jury that the railroad's message about the dangers of trains had gotten through to plaintiff's friends. Thus, contrary to defendants' argument here, the jury was adequately made aware of plaintiff's friends' knowledge of the dangers of jumping on the moving freight train. The circuit court

-24-

committed no abuse of discretion, and plaintiff suffered no prejudice, in the exclusion of any duplicative testimony concerning his friends' knowledge of said danger.

¶ 99    Next, defendants contend the circuit court erred by admitting evidence of other incidents of children jumping onto moving trains about which plaintiff was totally unaware. The circuit court committed no abuse of discretion in admitting this evidence. Pursuant to *Kahn*, 5 Ill. 2d at 625, plaintiff was required to prove that defendants knew young children habitually frequented their railroad tracks and that this presented a danger likely to injure them because they, by reason of their immaturity, were incapable of appreciating the risk of harm involved. To prove defendants knew young children habitually frequented their railroad tracks, the circuit court correctly permitted plaintiff to introduce evidence of numerous instances when IHB agents caught other children attempting to board trains. The fact plaintiff was unaware of these other incidents has no bearing on their admissibility into evidence on this point.

¶ 100    Next, defendants contend the circuit court erred in allowing Dr. Berg to testify about adolescent behavior, an issue about which he had no expertise. Specifically, defendants argue that the court improperly allowed Dr. Berg to testify that trains present a risk of harm to children due to their lack of maturity. Dr. Berg testified that his opinions regarding trains' risk of harm to children due to their lack of maturity is based on his work experience as a civil engineer "dealing with safety along railroad tracks" as well as his involvement with Operation Lifesaver personnel who go into the schools and explain railroad safety to children. Thus, Dr. Berg's testimony was based on the expertise he developed over the course of his career specializing in transportation and safety-related issues. The circuit court committed no abuse of discretion by admitting Dr. Berg's testimony as to the risk of harm trains posed to children due to their lack of maturity.

¶ 101    Defendants make cursory references to Dr. Berg's testimony violating Rule 213 (Ill. S. Ct. R. 213 (eff. Jan. 1, 2007)) or otherwise constituting an inadmissible legal opinion invading the province of the circuit court. Defendants' cursory references are insufficient to comply with Rule 341(h)(7)'s requirement that their brief contain arguments in support of their issues. See Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006). Accordingly, these issues are waived.

¶ 102    Next, defendants contend the circuit court erred in allowing Dr. Berg to testify on redirect examination about the effectiveness of IHB's policing efforts, an issue about which he had no expertise. The circuit court committed no abuse of discretion where defendants opened the door during cross-examination when they questioned Dr. Berg about IHB's policing efforts. See *People v. Crisp*, 242 Ill. App. 3d 652, 658 (1992).

¶ 103    Next, defendants contend the circuit court erred in admitting certain testimony of James Griffith, the special agent for the IHB police department, that was irrelevant and beyond his level of expertise. Specifically, defendants complain about Mr. Griffith's testimony that during his Operation Lifesaver presentations, he determined that kindergartners or preschool age children might not appreciate the dangers of the railroad to the same degree as some high school or junior high school students. Any error here actually inured to defendants' benefit, where Mr. Griffith's testimony supported defendants' argument that they owed no duty to

plaintiff due to the ability of children in his age range (junior high school and high school age) to appreciate the risks of danger involved here. In the absence of any prejudice to defendants, the circuit court committed no reversible error in the admission of Mr. Griffith's testimony.

¶ 104　　Next, defendants make a brief reference that Dr. Lencki's testimony regarding plaintiff's low-average intelligence was inadmissible. Defendants provide no argument in support thereof and have waived review of the issue. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006).

¶ 105　　In their *amicus curiae* brief, the Illinois Civil Justice League, Washington Legal Foundation, and Allied Educational Foundation argue that the circuit court erred in admitting Dr. Lencki's testimony for purposes of determining plaintiff's "mentality to appreciate the danger" of jumping aboard the freight train. As discussed above, "when ascertaining a child's appreciation of danger, our courts do not consider the subjective understandings and limitations of the child when a risk is deemed obvious to children generally. [Citations.] An undue burden would be placed on landowners in requiring them to focus on a minor's subjective inability to appreciate a risk." *Salinas*, 189 Ill. App. 3d at 61. "[A]lthough it is proper to consider the minor's actual knowledge where the child has some greater understanding than a typical child of his age [citations], defendants are not expected to foresee the unique mental and physical limitations of a particular minor in terms of ability to appreciate the risk." *Colls*, 212 Ill. App. 3d at 946.

¶ 106　　Thus, the circuit court erred in admitting Dr. Lencki's testimony for the purposes of showing plaintiff's subjective inability to appreciate the danger in jumping aboard the 9- to 10-mile-per-hour moving freight train. The error here was harmless, though, where Dr. Lencki testified that, the almost 13-year-old plaintiff (who had just finished sixth grade at the time he was injured), was not mentally challenged and that he was intelligent enough to meet his sixth grade requirements with the help of some supplemental educational services that already had been provided to him. Dr. Lencki's testimony indicates that plaintiff did not have any significantly decreased intelligence hampering his ability to appreciate the danger. Accordingly, defendants suffered no prejudice by the admission of Dr. Lencki's testimony.

¶ 107　　Next, defendants contend the circuit court erred by allowing plaintiff to cross-examine defendants' expert, Mr. Bradley, with a photograph for which he never established a foundation. The record indicates that, during direct examination, Mr. Bradley testified that Dr. Berg's proposed improvements (chain-link fencing and an overpass at Austin Avenue) would not be effective because it was unlikely any chain-link fencing would remain intact given that holes routinely are cut in such fences. Mr. Bradley also testified during direct examination that a steel or concrete wall could keep trespassers off the right-of-way, but that the property owners would not approve because such a wall would be unsightly. During cross-examination, plaintiff exhibited a photograph of a concrete wall, which Mr. Bradley agreed might not be susceptible to being cut. Defendants now argue on appeal that plaintiff introduced no foundational evidence with respect to who constructed the concrete wall exhibited in the photograph, where the wall was located, or how much it cost. Defendants argue that the court should not have permitted plaintiff to cross-examine Mr. Bradley with this photograph in the absence of proper foundational evidence. Any error was harmless, though, where Mr. Bradley's testimony on cross-examination regarding the photograph was

consistent with his testimony on direct examination that such a concrete wall could keep trespassers off the right-of-way. Defendants suffered no prejudice from Mr. Bradley's cross-examination on the photograph, and accordingly there was no reversible error.

¶ 108 Defendants argue that plaintiff improperly referenced the photograph during closing arguments. Defendants waived review by failing to object thereto. *Dienstag v. Margolies*, 396 Ill. App. 3d 25, 41 (2009).

¶ 109 Next, defendants contend a new trial is warranted because the verdict was against the manifest weight of the evidence. A verdict is against the manifest weight of the evidence when the opposite conclusion is evident or when the jury findings are unreasonable, arbitrary, and not based on any of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

¶ 110 Defendants argue that the manifest weight of the evidence shows that plaintiff fully appreciated the danger of jumping aboard a moving freight train and that defendants could not have inexpensively prevented him from embracing that risk. As discussed extensively above, plaintiff testified at trial that at the time he attempted to jump aboard the freight train, he did not appreciate the danger. Dr. Berg testified in considerable detail as to how defendants could have eliminated the danger at relatively low cost compared to the risk to children. Said evidence supported the jury's verdict, which was not against the manifest weight of the evidence.

¶ 111 Defendants make a cursory argument that the jury's finding that plaintiff was only 40% at fault was against the manifest weight of the evidence. Defendants fail to convincingly show why the finding of 40% fault was unreasonable, arbitrary, and not based on any of the evidence, or why an opposite conclusion is evident. In the absence of such a showing, we must reject defendants' argument that the jury's comparative fault finding is against the manifest weight of the evidence.

¶ 112 V. Whether Public Policy Considerations Require Reversal of the Judgment

¶ 113 The *amici*, the American Tort Reform Association, the Association of American Railroads, the Illinois Civil Justice League, Washington Legal Foundation, and Allied Educational Foundation, argue that public policy considerations require reversal of the judgment below. Specifically, they argue: (1) the judgment improperly transforms landowners into insurers against all injuries suffered by trespassing children; (2) the judgment improperly rewards bad behavior by compensating a trespasser who was injured due to his own irresponsible behavior; (3) the judgment substantially erodes the open and obvious danger exception to landowner liability, and injects substantial confusion into the law governing child trespassers; (4) the judgment saddles railroads with an extreme financial burden by requiring them to fence all their miles of right-of-way and to otherwise erect barriers to prevent trespasser entry; and (5) such a financial burden also will force railroads to divert funds from railroad operations that have a high utility to the general public. The *amici* argue that an opinion affirming the judgment below will allow these negative consequences to take effect to the detriment of all landowners and railroads and, ultimately, to the general public who rely thereon.

¶ 114 As discussed above, we affirm the judgment. However, our opinion here will not have

the far-reaching consequences attributed to it by the *amici*. Our holding does not transform landowners into insurers against all injuries suffered by trespassing children, but rather requires them to compensate only those children to whom they breached a duty of care owed under *Kahn*. Our holding does not improperly reward bad behavior by compensating a trespasser who was injured due to his own irresponsible behavior, but rather it affirms a jury verdict finding the railroads 60% liable to a trespassing child who foreseeably did not appreciate the dangers and full risk of harm from jumping aboard the slow-moving freight train and to whom a duty was owed under *Kahn*. Our holding does not substantially erode the open and obvious danger exception to landowner liability; rather, to the contrary, our holding affirms the continued viability of that exception and conforms with *Engel* in finding that the issue of whether the exception applied here was a question of fact and not a question of law. Our holding does not saddle railroads with an extreme financial burden by requiring them to fence all their miles of right-of-way and to otherwise erect barriers to prevent trespasser entry; rather, it affirms a jury verdict based in part on Dr. Berg's testimony that defendants were required to take remedial measures only along the 6,000-foot corridor between Central Avenue and Ridgeland Avenue. The total cost of the remedial measures (*i.e.*, chain-link fence plus overpass), as testified to by Dr. Berg, was approximately $175,000, which would not unduly hamper railroad operations having a high utility to the general public. We do not address whether defendants (or any other railroad) are required to fence their miles of right-of-ways or take other preventive measures against trespassers outside the 6,000-foot corridor between Central Avenue and Ridgeland Avenue.

¶ 115                            VI. Conclusion

¶ 116      For all the foregoing reasons, we affirm the circuit court. As a result of our disposition of this case, we need not address plaintiff's arguments regarding the applicability of the frequent trespass doctrine or scientific research in the area of adolescent brain development.

¶ 117      Affirmed.